835 A.2d 340 (2003)
364 N.J. Super. 263
In the Matter of C.R.
New Jersey Division of Youth and Family Services, Plaintiff-Respondent,
v.
E.R., Defendant-Respondent,
In the Matter of The Guardianship of C.R., Minor-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted September 10, 2003.
Argued September 10, 2003.
Decided November 17, 2003.
*341 Stephen J. McGee, Vernon, attorney for appellants, Edward and Donna Goodrich in A-0817-02T2F.
Peter C. Harvey, Attorney General, attorney for respondent, Division of Youth and Family Services in A-0817-02T2F (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Susan Brown-Peitz, Deputy Attorney General, on the brief).
Ellen J. Goldfinger, Assistant Deputy Public Defender, Law Guardian, argued the cause for minor-appellant in A-2024-02T4 (Yvonne Smith Segars, Public Defender, attorney; Joseph F. Suozzo, Deputy Public Defender and Ms. Goldfinger, of counsel and on the brief).
Jessica M. Steinglass, Deputy Attorney General, argued the cause for respondent, Division of Youth and Family Services in A-2024-02T4 (Peter C. Harvey, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Steinglass, on the brief).
Respondent E.R. in A-2024-02T4 did not file a brief.
Before Judges KING, LINTNER and LISA.
Submitted (A-0817-02T2F) September 10, 2003.
Argued (A-2024-02T4) September 10, 2003.
The opinion of the court was delivered by LISA, J.A.D.
We are confronted in this appeal with competing requests and recommendations for the placement for adoption of C.R., a female born on February 8, 2002. C.R. is the tenth child born to her mother. None of the children are in the mother's custody. The identity of C.R.'s father is unknown. In a termination proceeding initiated by the New Jersey Division of Youth and Family Services (DYFS or the Division), the mother defaulted, and the Family Part judge, on November 22, 2002, after consideration of the evidence submitted, ordered the termination of the parental rights of C.R.'s mother and father, "whomsoever he may be." No one appeals that order.
Prior to the termination, these events transpired. Immediately after C.R.'s birth, DYFS sought and obtained legal and physical custody of her. On March 20, 2002, Elwood and Dianne Green (fictitious names) petitioned DYFS to place C.R. in their home. The Greens were the adoptive parents of three of C.R.'s siblings, had previously had other siblings of C.R. residing in their household, and provided for ongoing contact between the siblings living in their home and most of C.R.'s other siblings. DYFS refused to place C.R. with the Greens because they exceeded the *342 "population limitation" of eight children provided for in Division policies. Although those policies allow for waivers under certain circumstances, including the recognized desirability of keeping sibling groups together, DYFS refused to seek a waiver.
C.R.'s law guardian, acting on C.R.'s behalf, joined in the request for placement with the Greens, asserting C.R.'s "sibling rights." The law guardian expressed this position to DYFS and to the Family Part judge presiding over the guardianship action. The Child Placement Review Board (CPRB) also recommended placement with the Greens, expressly disagreeing with the Division's position. By June 2002, DYFS had formulated a permanency plan that would place C.R. in a pre-adoptive foster home. The law guardian moved to prevent the placement and requested a hearing in the guardianship action to determine whether placement with the Greens or the other foster parents would be in C.R.'s best interests.
On June 14, 2002, the Family Part judge determined that he lacked jurisdiction to entertain the dispute, concluding that DYFS has sole discretion in placing children in foster care and moving them from one foster home to another, subject to internal Division review and administrative appeal, and subject to judicial review only in the Appellate Division. On June 28, 2002 the law guardian petitioned the Family Part judge to conduct a summary hearing under the Child Placement Review Act (Act), N.J.S.A. 30:4C-50 to -65, to determine which placement would be in C.R.'s best interests. The law guardian also sought to prevent the Division's intended placement of C.R. in a pre-adoptive home other than the Greens'. The judge refused to intervene, and on July 2, 2002 DYFS placed C.R. in the pre-adoptive foster home, where she has since resided. We have entered an order staying the adoption of C.R. pending appeal.
At the time of the termination proceeding in November 2002, the law guardian again argued for C.R.'s placement in the Greens' home and again requested that the court conduct a best interests hearing to resolve the placement issue. The law guardian was armed with a report and supplemental report by a psychological expert opining that C.R.'s best interests would be served by placement with her siblings in the Greens' home. The judge again refused to interfere with the Division's placement decision because of lack of jurisdiction.
We disagree. We are satisfied that a sufficient showing was made by the law guardian, bolstered by the concurring CPRB recommendation, to establish the reasonable plausibility that C.R.'s best interests would be served by a permanent placement plan providing for her placement for adoption with the Greens. Of course, the Division's plan, rejecting the Greens because of the population issue and providing for placement for adoption with other foster parents, was also reasonably plausible. We hold that jurisdiction to resolve the dispute lies in the Family Part, which has an obligation to conduct a full evidentiary hearing to determine what permanent placement plan is in C.R.'s best interests.

I
We have before us two appeals, which we have calendared back-to-back, and which we address in this single opinion. The Greens' appeal of DYFS's decision denying their request for placement of C.R. in their home is docketed at A-0817-02T2F. The law guardian's appeal of various orders of the Family Part judge under FG-09-177-02 and FC-09-387-02, refusing to conduct a best interests hearing *343 because of lack of jurisdiction, is docketed at A-2024-02T4.
C.R. was born to E.R. on February 8, 2002 at Christ Hospital in Jersey City. C.R. tested positive at birth for cocaine and syphilis. On February 25, 2002, DYFS filed a verified complaint alleging neglect and obtained a court order placing C.R. under its custody, care and supervision, and appointing a law guardian (FN-09-282-02). A guardianship complaint was filed on May 28, 2002 (FG-09-177-02).
C.R. was discharged from Christ Hospital on February 22, 2002 and placed by DYFS at Hudson Cradle. She remained there until May 16, 2002, when she was placed in a foster home. She remained there until DYFS placed her on July 2, 2002 in her current foster home.
Between 1990 and 2002, the Greens were DYFS-approved foster parents and the Division had placed approximately thirty-three children in their home. The Greens have three biological children. At the time of C.R.'s birth, two of the biological children were emancipated, and one, a sixteen-year-old son, was living at home. At that time the Greens also had nine other children in their home. Seven, including three of C.R.'s sisters, were adopted, and two were foster children. We are advised by counsel that since completion of the trial court and DYFS administrative proceedings, one of the foster children has been reunited with her family and no longer resides in the Greens' home.
E.R.'s oldest child, M.L., born in 1984, was placed by the Division with her grandmother. One of her children, G.R.I., born on January 17, 1998, was placed with the Greens, and died of SIDS while in their care on April 3, 1998. The remaining seven have been adopted: three by the Greens, two by a family in Bayonne, one by a family in Bloomfield, and one by a family in Prospect Park. In addition to G.R.I. and the three adoptive siblings of C.R., two other siblings of C.R. have resided at times in the Green household. One was in their foster care for six weeks before her adoption. Another, who had been adopted by other parents stayed with the Greens for six months, from January to July 2001, when her adoptive mother was ill and unable to care for her. In the summer of 2002, that child spent a week with the Greens, visiting her sisters.
The Greens have regularly invited the siblings of their adopted children born to E.R. to join the family for special occasions. Elwood Green is a sales manager at a car dealership located only five minutes from home, and he is available to come home from work from time to time when needed to assist with the children. Dianne Green does not work outside the home. On May 18, 2001, Elwood and Dianne Green were presented with the "DYFS Director's Award," the Division's highest commendation.

II
DYFS has never questioned the fitness of the Greens. The sole basis for refusing to place C.R. in their care was violation of the Division's population limitation policy, as embodied in the Division's "Field Operations Casework Policy and Procedures Manual" (Manual). Section 1502.1b of the Manual provides that children shall not be placed in a foster home where the placement will result in:
 More than a total of eight children in that foster family including the foster family's natural and adoptive children and other children living in the home;
 More than five foster children living in the home;
 More than four children under six years of age living in the home;
*344  More than two children under two years of age in the home; or
 More than two children over two years of age who are non-ambulatory living in the home.
Section 1502.1c allows exceptions to the population limitations, in compelling or exceptional circumstances, including but not limited to:
 Placement in excess of the population limitations is necessary to keep a sibling group together;
 Placement in excess of the population limitations is necessary because the particular foster parent is uniquely qualified to meet the specific needs of a particular child; or
 An additional approved primary adult caregiver resides in the foster home. The additional caregiver shall have completed the required pre-service training and met all other foster parent requirements.
In all such circumstances, the home must be in substantial compliance with State foster home regulations.

Exceptions are authorized for the placement of specific children only. A foster home shall not be authorized to routinely care for numbers of children that exceed the population limitations above.
In response to the Greens' initial request to DYFS for C.R.'s placement, the manager of the Jersey City DYFS office responded with a letter on April 5, 2002, stating that her office, "in consultation with the Northern Adoption Resource Center, had decided not to pursue a waiver for the purposes of placing [C.R.] in your home." The letter stated the presence of siblings in the home was not a sufficient basis for a population limitation waiver. Although the letter concluded with the comment that C.R.'s needs "are such that she requires a placement in a setting where there are significantly fewer children," the record established that any medical problems at birth were quickly resolved. C.R. experienced no withdrawal symptoms from the cocaine exposure and needed no treatment. Regarding syphilis, one record described the condition as "positive" at birth, but another described it as "exposure to syphilis." The records reflect that intravenous antibiotic therapy was administered as "a preventative measure," and was successful, concluding she "now does not have it." There is no suggestion in the intermediate or final administrative review decisions within the Division that C.R. has any special needs.
The internal administrative appeal available to the Greens was a local dispositional review by the Northern Adoption Resource Center, the same office with which the Division's local district office consulted in making the initial denial. After meeting with the Greens and the law guardian, the manager of the Northern Adoption Resource Center, although impressed with the Greens' commitment to fostering sibling relations and their general good performance in caring for children, again denied their request for placement of C.R. solely because of the population limitation policy. No further analysis was provided.
The Greens availed themselves of the final internal review, with the Regional Adoption Resource Center. This dispositional review hearing consisted of a meeting with Dianne Green and a representative of the Foster Parent Association, who supported the Greens' request for C.R.'s placement, and document review. The final administrative decision, issued by the Assistant Director on August 22, 2002, affirmed the decision of the Northern Adoption Resource Center. The Assistant Director acknowledged the importance of maintaining sibling relationships, but also observed the countervailing consideration *345 supported by the population limitation policy "to insure that a foster family is not stretched beyond their ability to function well." It was noted that the Greens had recently been granted a population waiver to allow placement of a foster child in their home to unite her with a sibling already residing with the Greens. (That is the child who subsequently left the Greens' home to be reunited with her family.)
The Assistant Director concluded: "While it is possible that Mr. and Mrs. [Green] can provide excellent care for an additional child, this is an outcome the Division can not insure. There is no way to foretell at what point this family will reach its limits. All families have a limit to the number of children they can care for, no matter how well they are functioning at the current time." The Assistant Director also noted that the foster parents with whom the Division placed C.R. had the ability and expressed a willingness to take any new children who may be born to E.R. and to foster relations between C.R. and her siblings. The latter point is belied by a complete lack of contact between C.R. and her siblings in the Greens' home. The Division successfully opposed the law guardian's application in the Family Part for visitation between C.R. and her siblings, and C.R.'s foster parents have apparently not voluntarily allowed any such visitation.
As we have stated, the Greens' appeal of this final DYFS administrative action is now before us under docket A-0817-02T2F. On appeal, the Greens argue that the DYFS population limitation policy is not authorized by statute nor DYFS regulations and is ultra vires. Alternatively, they argue that denial of C.R.'s placement with them was contrary to DYFS's policy and was arbitrary, capricious and unreasonable. In light of our disposition of the law guardian's appeal, we find it unnecessary to resolve these issues at this time. We therefore order that the Greens' appeal (A-0817-02T2F) will be stayed, pending conclusion of the remand proceedings in the Family Part resulting from the law guardian's appeal (A-2024-02T4). We have described the DYFS policy and proceedings because they play a role in our analysis and conclusions in the law guardian's appeal.

III
On April 2, 2002, the trial judge entered a permanency order in the neglect action declaring appropriate the Division's goal of terminating parental rights and placing C.R. for adoption. On April 22, 2002, the CPRB recommended that C.R.'s placement continue until DYFS's long-term goal of adoption was achieved. On June 24, 2002, the CPRB conducted a "special review" because it had "failed to recommend" in the April 22 review "that [C.R.] be placed with her three siblings in the [Green] home." According to the CPRB, an "appropriate" adoptive home "would seem to be with [C.R.]'s three siblings." In July, the judge entered another order, which simply required that C.R. continue in a placement outside the home on a temporary basis until the long-term goal of adoption was achieved. The order made no mention of the Greens. On August 12, 2002, the CPRB stated: "CPR Board disagrees with [C.R.]'s placement. Board feels it would be in child's best interests to be placed with her siblings in the [Green] home."
On the same day that the Greens requested a regional dispositional hearing (June 4, 2002), C.R.'s law guardian requested an emergent hearing in the neglect and guardian matters on the issue of whether C.R. should be placed with the Greens, claiming that it was in C.R.'s best interests to be placed and raised with her *346 siblings. At the hearing on June 14, 2002, counsel for DYFS stated that, while DYFS had no concern about the Greens' competency to parent, it was concerned that they already had ten children in their home. Moreover, DYFS contended that its decisions pertaining to the care and custody of children were not subject to review by the Family Part, but rather the decision was subject only to internal, followed by appellate, review.
Although the judge believed the law guardian had standing to make an application seeking a transfer in custody from one foster home to another, he did not believe that the Family Part had jurisdiction to review the placement. According to the judge, DYFS had "the right to keep the child in whatever foster home they feel is appropriate," and the Greens' appeal would have to proceed "administratively."
On June 28, 2002, the law guardian wrote to the judge in the guardianship matter and advised him that the CPRB had recommended, in a special review, that C.R. be placed in the Green home. In light of the law guardian's belief that the CPRB's recommendation was "radically different from" DYFS's plan, the law guardian requested a summary hearing pursuant to N.J.S.A. 30:4C-61(b). Because DYFS planned to move C.R. to a different foster home on July 2, 2002, the law guardian requested that the judge stay the move pending the hearing.
On October 17, 2002, default was entered against E.R., and a proof hearing was scheduled for November 21, 2002. At the proof hearing, E.R.'s parental rights, as well as the parental rights of C.R.'s father, "whomsoever he may be," were terminated. In addition, the law guardian renewed her application to have C.R. placed with the Greens. The application was denied. The judge stated he had already ruled on the application in June, the decision where to place the child belonged to DYFS, and the remedy was in the administrative appeal process.
The proof hearing continued on November 22, 2002, and upon its conclusion, the judge ordered termination of parental rights and granted DYFS guardianship of C.R. for all purposes, including placement for adoption.
The judge also denied the law guardian's motions for both visits between C.R. and her siblings and a stay of the adoption proceeding pending appeal. The judge reasoned that visitation was not required because the termination of parental rights "cuts off all of the relationships," and sibling visitation provided no benefit to nine-month-old C.R., who was too young to understand "the concept of sibling visits." A stay of the adoption proceeding was denied on the ground that the evidence supporting termination was overwhelming, and the Family Part had "no authority to control the placement of a child in a foster home during the pendency of the guardianship proceeding."
The law guardian appeals various orders by which the Family Part judge refused to accept jurisdiction over C.R.'s permanent placement and refused to conduct a best interests hearing. This appeal is docketed at A-2024-02T4. As stated, we ordered a stay of adoption pending the appeal.

IV
DYFS relies on provisions of the Act in support of its argument that the CPRB and Family Part lack jurisdiction to interfere with DYFS's placement decisions. It argues that the Act establishes procedures for both administrative and judicial review of the placement of children in the Division's custody. N.J.S.A. 30:4C-51. It points out that the Act requires the CPRB to make one of three findings: (1) that *347 continued placement outside the home is not in the child's best interest and the child should be returned home; (2) that continued placement outside the home is in the child's best interests temporarily until the long-term goal is achieved; or (3) that continued placement outside the home is in the child's best interests on a temporary basis but that insufficient information precluded the CPRB from making a recommendation. N.J.S.A. 30:4C-60(a)-(c).
DYFS argues that this is the limit of the CPRB's power and asserts that the rationale in State in the Interest of J.B., 293 N.J.Super. 485, 681 A.2d 668 (Ch.Div. 1996), is dispositive. There, the court held that the Act was not the proper vehicle for resolution of the issue concerning which particular foster home a child may or may not reside in. In J.B., DYFS removed three children from the care of their long-term foster parents, who had planned to adopt them. Id. at 486, 681 A.2d 668. The foster parents were unsuccessful in their attempt to challenge the decision at the DYFS local and regional dispositional conferences. Id. at 486-87, 681 A.2d 668.
Even though the foster parents in that case were informed they had the right to appeal the final DYFS decision to the Appellate Division, they failed to do so. Id. at 487, 681 A.2d 668. Instead, the foster parents requested a child placement review hearing. Ibid. DYFS challenged the court's jurisdiction. Ibid.
The judge concluded "the Act is not the proper vehicle for a resolution of what specific foster home a child may or may not reside in." Id. at 489, 681 A.2d 668. The judge analyzed various statutory and regulatory provisions in support of his conclusions that "DYFS possesses considerable discretion in the selection of foster care providers and in the process of placing children who are in need of protection in foster homes" and that whether the children should be removed from their foster parents and placed elsewhere was "a matter to be resolved finally by the [DYFS] Director and reviewed `solely' by the Appellate Division." Id. at 489-90, 681 A.2d 668.
In In Re E.M.B., 348 N.J.Super. 31, 791 A.2d 256 (App.Div.2002), however, where the efficacy of DYFS's proposed permanency plan was at issue, this court reached a contrary result. There, as here, all parties agreed that termination of parental rights was in the children's best interests, but a dispute arose regarding which adoptive home would serve the children's best interests. DYFS's permanency plan proposed foster parent adoption. Id. at 37, 791 A.2d 256. The CPRB rejected that plan and recommended grandparent adoption. Id. at 39, 791 A.2d 256. The grandparents unsuccessfully pursued their internal DYFS administrative reviews. Id. at 37-40, 791 A.2d 256. As requested by the CPRB, the court held a summary hearing, at which
DYFS argued that the Family Part and child placement review board had no jurisdiction to review the placement plan; that an administrative appeal by the grandparents from the DYFS foster parent adoption plan was being processed and constituted adequate review of its placement decision; and that the grandparents' ultimate remedy would be an appeal to this court from any adverse administrative decision.
[Id. at 40, 791 A.2d 256.]
The Family Part judge rejected those arguments and ordered a best interests hearing. Id. at 41, 791 A.2d 256. We granted DYFS's motion for leave to appeal. Ibid.
Judge Fall engaged in a comprehensive analysis of the Act and applicable case law, and concluded that "the Act contemplates an independent judicial review of DYFS's *348 permanency plan, separate and apart from any rights the grandparents may possess to contest the internal administrative decision of DYFS." Id. at 48, 791 A.2d 256. He distinguished J.B., because there the issue "did not involve a permanent placement planning review issue under the Act," whereas in E.M.B. "the issue for resolution is the ultimate permanency issueamong those bonded to the children, who should be permitted to adopt? That issue is for the Family Part to determine through application of the procedures set forth in the Act for review of the permanency placement plan." Id. at 49, 791 A.2d 256.
DYFS argues that E.M.B. should be read narrowly, limited to the factual context of two sets of prospective adoptive parents where there is evidence that the children are bonded to both. The trial judge agreed, concluded that E.M.B. was inapplicable to this case, and, following the J.B. rationale, found he lacked jurisdiction to resolve the dispute. We do not agree.
DYFS has made the same arguments in the case before us as it made in E.M.B. The legal principles are the same. The factual distinction advanced by DYFS and accepted by the trial court does not compel a different result. In E.M.B. the competing placements were both reasonably plausible because competent evidence, in the nature of expert reports, was put forth that the children were bonded to both the grandparents and the foster parents, with whom they had lived for a considerable time. In this case, the DYFS plan is reasonably plausible because it provides for adoption by foster parents approved and selected by DYFS, in its expertise, who are likely to be appropriate. The opposing plan, advanced by the CPRB and the law guardian, is also reasonably plausible because the Greens are the adoptive parents of three of C.R.'s siblings.
Bonding is obviously an important factor to be considered in permanent placement evaluation. So too is the interest of a child to maintain a relationship with his or her siblings. Through her law guardian, C.R. asserts her sibling rights here, saying, in essence, "I want to live with, grow up with, and be part of a family that includes my 3 sisters."
Sibling rights have gained recognition in our statutory enactments and decisional law. The "Child Placement Bill of Rights Act," N.J.S.A. 9:6B-1 to -6, declares it is a child's right, when placed outside the home,
consistent with the health, safety and physical and psychological welfare of the child and as appropriate to the individual circumstances of the child's physical or mental development:
....
d. To the best efforts of the applicable department to [be] place[d] ... in the same setting with the child's sibling if the sibling is also being placed outside his [or her] home;
....
f. To visit with the child's sibling on a regular basis and to otherwise maintain contact with the child's sibling if the child was separated from his [or her] sibling upon placement outside his [or her] home, including the provision or arrangement of transportation if necessary.
[N.J.S.A. 9:6B-4d, f.]
Children who are not placed outside their home may apply for sibling visitation, which shall be granted if it is in their best interests. N.J.S.A. 9:2-7.1a.
Our Supreme Court has recently expressed the fundamental importance of familial relationships, and, in particular, of sibling relationships. In re Guardianship of J.N.H., 172 N.J. 440, 799 A.2d 518 *349 (2002). The Court remanded a termination matter for a hearing to consider whether Rule 4:50-1 relief from a termination order was appropriate, and directed that "[p]art and parcel of such an inquiry should be the effect of permanently terminating [the child's] connection to his siblings." Id. at 478, 799 A.2d 518. In a case pre-dating the adoption of the sibling rights statutes we have mentioned, a court held, when considering a sibling visitation issue: "To be able to establish and nurture [a sibling] relationship is, without question, a natural, inalienable right which is bestowed upon one merely by virtue of birth into the same family." L. v. G., 203 N.J.Super. 385, 391, 497 A.2d 215 (Ch.Div. 1985).
We hasten to add that any recognition of sibling rights is not unfettered. The statutory and decisional authorities we have cited condition the rights of children to maintain relationships with their siblings on a best interests determination. DYFS does not deny the importance of sibling rights in placement evaluations. Indeed, its Field Operations Casework Policy and Procedures Manual is replete with provisions acknowledging the importance of keeping sibling groups together when feasible.
The question presented in this case is not whether it is desirable to keep a sibling group together but whether, when a contrary indication induces DYFS to rule out a placement that would keep siblings together, the resolution should lie within the agency or in the Family Part. The population limitation policy provided such a contrary indication in this case.
In the internal administrative proceedings, no evidence was presented, and as a reviewing court we are uninformed of the particular circumstances weighing in favor of and against the potential placement of C.R. with her siblings in the Green home. Moreover, the administrative proceeding was monolithic, focusing only on the population limitation policy. As we stated in E.M.B., "the administrative review process offered by DYFS is not the type of plenary review desirable for resolution of the fundamental issue of whether a permanency placement plan effectuates the best interest of children." E.M.B. supra, 348 N.J.Super. at 51, 791 A.2d 256.
We have also reached this conclusion about the respective roles of DYFS, the CPRB and the Family Part in resolving final placement disputes under the Act:
What becomes clear from this statutory scheme is that the best interests of the child is the polestar in the implementation of a placement plan. Moreover, while the Act no doubt vests wide discretion in both the Division and the Board to devise and recommend a plan, the trial court is not bound by it. N.J.S.A. 30:4C-61a provides that [u]pon review of the board's report, the family part of the Chancery Division of the Superior Court shall issue an order concerning the child's placement which it deems will best serve the interests of the child. (emphasis added). Indeed, the legislative history of the Act makes clear that independent, judicial review of the Division's plan is necessary, because it is possible for a child to remain in foster care throughout his or her childhood without ever having [an] official and impartial determination [by the court] as to whether the child's best interests are being served by such placement. See Statement to Senate Bill No. 3246 (1977) (emphasis added). Thus, the Chancery Division shall make its own best interests analysis based on the entire record, including the recommendations of the Division and the Board, as well as information obtained from other pertinent sources. See N.J.S.A. 30:4C-61c. *350 [State in Interest of L.L., 265 N.J.Super. 68, 77-78, 625 A.2d 559 (App.Div. 1993).]
It is thus clear that the totality of the circumstances must be considered. This requires a full hearing, at which evidence supporting or opposing the conflicting viewpoints can be presented by parties in interest. Indeed, C.R. was not a party to the DYFS administrative proceedings and had no opportunity there to present evidence in support of her sibling rights assertion and why it would be in her best interests to be adopted by the Greens. She also did not have the opportunity to refute the Division's unyielding position on the population limitation policy under all of the circumstances in her case.
N.J.S.A. 30:4C-60 authorizes the CPRB to make one of three prescribed recommendations that we earlier discussed. DYFS argues that this provision strictly limits the scope of the CPRB's authority, and does not allow for consideration by the CPRB of the specific placement chosen by DYFS. However, N.J.S.A. 30:4C:60 also provides:

In addition to the finding [of one of the three recommendations], the board shall state in its report if the placement plan satisfies the criteria provided in [N.J.S.A. 30:4C-58] and if it does not, that the placement plan should be modified or a new plan should be developed.
When making its finding pursuant to this section, the child's health, safety and need for permanency shall be of paramount concern to the board.

[Emphasis added.]
Among the criteria in N.J.S.A. 30:4C-58 are: "The appropriateness of the goal and objectives of the placement plan," N.J.S.A. 30:4C-58a; "Whether the child has siblings who are also placed outside their home," N.J.S.A. 30:4C-58c; "Whether the wishes of the child were considered," N.J.S.A. 30:4C-58d; and "The circumstances surrounding the placement," N.J.S.A. 30:4C-58h. It is clear to us that the statutory scheme envisions a scope of review by the CPRB and the Family Part that includes the specific placement proposed by DYFS, not merely the fact that placement for adoption is proposed.
It is also clear that if a child is placed in an adoptive home prior to completion of the initial review by the Family Part, the court retains jurisdiction to complete the review. N.J.S.A. 30:4C-58.1. There was no effective review here of the competing contentions, which were timely raised by the law guardian, because the court found a lack of jurisdiction. E.M.B., supra, 348 N.J.Super. at 46-47, 791 A.2d 256. We reject the Division's position that once it is awarded guardianship by court order it has the final say, subject only to appellate review, regarding placement. DYFS's guardianship status is not immutable. It remains subject to the supervision of the Family Part, which has the ultimate parens patriae responsibility for the child. In re Guardianship of K.H.O., 161 N.J. 337, 347, 736 A.2d 1246 (1999). Indeed, the Legislature has vested the Family Part with the authority to remove DYFS as guardian. N.J.S.A. 30:4C-21.
In addition to its attempt to factually distinguish this case from E.M.B., the Division attempts to place this case outside the reach of our holding in E.M.B. by seeking shelter under the umbrella of its population limitation policy. We cannot countenance this approach. Certainly, the size of the household and the ability of the family to absorb another child are appropriate considerations in the best interests evaluation. The Division's policy on this issue is a factor worthy of consideration, but it must be considered as one factor in the totality of the circumstances. The *351 factfinder must qualitatively weigh and balance all relevant circumstances, including, but not limited to, C.R.'s assertion of her sibling rights, the size of the Green household, and its ability to add another child without impairing the welfare of other children already there or the one to be added. Because C.R. is now twenty-one months old and has lived with her foster parents for the last sixteen months, her bonding to them may well be an issue.
We find unpersuasive the Division's and the trial judge's reliance on Doe v. State, 165 N.J.Super. 392, 398 A.2d 562 (App.Div. 1979). In that case, the foster parents of D.W. filed a Chancery Division action against DYFS and D.W.'s natural parents, seeking a restraint on increased visitation by the natural parents, termination of parental rights, adoption by the foster parents, or, alternatively, guardianship. Id. at 396, 398 A.2d 562. Two months into the litigation, DYFS unilaterally removed D.W. from the plaintiffs' physical custody and returned her to her natural parents. Id. at 397, 398 A.2d 562. The trial judge granted DYFS's motion to dismiss the action for lack of jurisdiction to review DYFS's action, and plaintiffs appealed. Ibid. We held that the core issue in the litigation was the propriety of the administrative decision of DYFS to return D.W. to her natural parents and jurisdiction to consider an attack on that decision is vested solely in the Appellate Division. Id. at 399-400, 398 A.2d 562.
Although that is a correct statement of the precise holding, Doe does not support the Division's position for two reasons. First and foremost, Doe was not decided in accordance with the Act, which affords greater authority to the trial court to review DYFS placements. The trial court proceedings under review were concluded in 1977. The Act became effective on October 1, 1978. L. 1978, c. 54, § 1. In Doe, decided on January 24, 1979, referring to the recently-adopted Act, we commented:
This act lodged broad powers in the Juvenile and Domestic Relations Court to review all voluntary and most involuntary placements of children in foster homes, their removal from the foster homes or changes in their placement. In the discharge of this obligation, the court is authorized to hold a hearing to determine whether the placement or change in placement contemplated by DYFS is in the best interests of the child.

[Id. at 404, 398 A.2d 562 (emphasis added).]
We concluded in Doe that a plenary evidentiary hearing was essential. Id. at 409, 398 A.2d 562. In discussing the appropriate forum for the hearing, we noted that under the Act, in the event of a placement dispute, "a hearing shall be held in the Juvenile and Domestic Relations Court." Ibid. We noted, however, that "this case does not come within that statute." Ibid. (emphasis added).
Further, both DYFS and the Family Part judge overlook an important aspect of the Doe decision. We recognized in Doe the need for a plenary hearing to provide an appropriate record for appellate review. Id. at 405, 398 A.2d 562. We held that the plaintiffs were entitled to compel discovery, present witnesses on their behalf, and cross-examine witnesses supporting DYFS's position. Id. at 406, 398 A.2d 562. We remanded for a hearing in the trial court, id. at 409, 398 A.2d 562, which "shall proceed to a determination of what custody decision will be in the best interests of the child." Id. at 410, 398 A.2d 562. The hearing would culminate in an order by the trial judge "reflect[ing] careful judicial scrutiny of the competing custody claims in light of the evidence presented" and "explicitly stat[ing] the basis for the *352 conclusion reached." Ibid. This result establishes the same framework that we order in the case before us.

V
Of course, we do not decide or forecast what the result should be. We decide only where jurisdiction lies to decide the issue. DYFS policy cannot supercede the paramount authority of the Family Part, imbued with its traditional parens patriae responsibility and vested by the Legislature with the task of finally approving the permanency placement plans of children removed from their homes. If the Family Part possesses the responsibility and authority to approve such plans, N.J.S.A. 30:4C-61.2, it follows logically that when a bona fide dispute is presented by parties with standing, between competing plans that are reasonably plausible, it is the Family Part that must resolve the dispute. We have concluded that this result is required by the Act. Our conclusion is bolstered by several considerations: (1) Family Part judges possess recognized expertise in making best interests determinations, see Cesare v. Cesare, 154 N.J. 394, 413, 713 A.2d 390 (1998); (2) A trial court hearing develops a complete evidentiary record to facilitate appellate review; and (3) The Family Part provides an impartial arbiter and a neutral forum for resolution of the dispute, as opposed to the entity which is itself one of the contestants.
In the hearing on remand, the court shall consider the matter from a clean slate. Neither of the proposed plans is entitled to a presumption of correctness. E.M.B., supra, 348 N.J.Super. at 52, 791 A.2d 256. The court is to receive testimony, evidence and information from all relevant sources pertaining to C.R.'s best interests and determine a permanency plan that ensures her safety and health and serves her best interests. Ibid.
On the appeal of the law guardian docketed at A-2024-02T4, the matter is reversed and remanded for further proceedings in the Family Part consistent with this opinion. The appeal of the Greens, docketed at A-0817-02T2F, is stayed pending completion of the remand proceedings in the Family Part of the other matter, with leave to the Greens to reactivate it at that time. We do not retain jurisdiction.