**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4065-15T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

M.S.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF T.M.E.C.M.,
A MINOR.

_____

Submitted February 27, 2017 – Decided  April 4, 2017

Before Judges Sabatino and Currier.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FG-03-45-15.

Joseph E. Krakora, Public Defender, attorney for appellant (Christine B. Mowry, Designated Counsel, on the briefs).

Christopher S. Porrino, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Kosha Gala, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Karen A. Lodeserto, Designated Counsel, on the brief).

PER CURIAM

Defendant M.S.[1] appeals from the May 9, 2016 order terminating her parental rights to her daughter T.M.E.C.M. (Terri).[2] She argues that the Division of Child Protection and Permanency (Division) did not prove the third and fourth prongs of the best interests of the child standard as set forth in N.J.S.A. 30:4C-15.1(a)(3) and (4).[3] After a review of these arguments in light of the applicable legal principles, we affirm.

We derive our facts from the testimony presented at the guardianship trial that took place on several dates between January and April 2016.

Defendant has a long history with the Division, which began providing court-ordered services to her as a teenager, in 1986. Ten years later, in 1996, the Division became involved with her as a parent. Over the course of many years, the Family Part on

---

[1] We use initials and pseudonyms for the family members to protect the privacy of the minors involved.

[2] Terri's father, H.M., surrendered his parental rights prior to the guardianship trial.

[3] We acknowledge the letter brief submitted by defendant in November 2016 in further support of her appeal.

multiple occasions granted the Division custody of defendant's two older children, Peter and Ralph, due to defendant's arrests and incarceration for various offenses. The Family Court terminated defendant's parental rights to Ralph in 2008, and we affirmed that decision. See N.J. Div. of Youth & Family Servs. v. M.S., No. A-4828-09 (App. Div. Dec. 30, 2011). Ralph was adopted by his resource parent, L.B. (Linda). Peter also lived temporarily with Linda until 2013 when he aged out of the child welfare system and moved in with defendant.

Terri was born in 2012, while the Division still had an open case for supervision of Peter. She was placed in a resource home with a paternal relative, R.A. (Ruth), upon her release from the hospital, where she remained at the time of the trial. Ruth desires to adopt Terri. Defendant has never had custody of her daughter.

Defendant suffers from serious medical issues — both physical and mental. She was hospitalized after Terri's birth, due to complications from diabetes and MRSA (methicillin-resistant staphylococcus aureus). As a result of her diabetes she was in a coma between March and April 2013. After her release from the hospital, she spent time at various rehabilitation facilities and did not return home until July 2013.

Over the next several years, defendant suffered additional

serious medical problems, including complications from weight loss surgery, pneumonia, kidney dialysis, and a leg fracture, which resulted in multiple stays in hospitals and rehabilitation facilities. She uses a wheelchair and requires significant assistance with daily life activities, including bathing and toileting. At the time of trial, Peter was being paid by the State to serve as her home health aide; he also had a job outside the home.

Despite her many medical problems, the Division provided services to defendant in an attempt to effectuate a goal of family reunification. The services included individual therapy and parenting classes in her home, and supervised visitation with her daughter, which included transportation of the child to defendant's location, be it her home or a medical facility. A number of visits were canceled because of defendant's medical problems.

During those visits, defendant was never able to care for Terri independently. She required assistance from others, primarily Peter. Nevertheless, the visits generally went smoothly, with Terri interacting well with defendant and others present. The only significant safety concern was occasional smoke in the home, which was problematic given Terri's asthma.

The Division considered, and ruled out, a variety of placement

options in addition to Ruth. At trial, defendant complained only about the rule-out of Linda, Ralph's adoptive mother, who was considered as a placement for Terri on two separate occasions.

Linda was considered twice as a placement for Terri. Originally, her home was licensed as a therapeutic home, which posed two problems. First, one of the children in Linda's care was sexually aggressive, which presented safety concerns for an infant. Second, at the time, the Division did not permit dual licenses of a home as a regular resource home and as a therapeutic home, and Terri did not require therapeutic services. Therefore, Linda would have had to change her license to take Terri, meaning that other children in her care would be removed, a change Linda was not willing to make. Again in 2015 Linda was reconsidered for placement, but ultimately it was determined that it was in Terri's best interests to remain with Ruth.

At the guardianship trial, defendant argued that reunification was the proper outcome or, in the alternative, Terri should be placed with her brother Ralph at Linda's home. All of the parties' experts agreed that defendant was incapable of providing safe parenting for Terri, and she would not be able to do so in the foreseeable future, despite the years of services provided by the Division. Thus, the question became whether there was anyone else who could assist defendant in parenting Terri.

In his 2014 report, the Division's psychologist, Jason Fleming, Psy.D., recommended that the Division investigate the ability and willingness of Peter, then twenty-two years old, to assist in caring for his sister. Similarly, physicians who examined defendant in 2014 and 2015 suggested she might be able to physically care for Terri with assistance from Peter, and defendant asked the Division to consider Peter as a parenting option.

Occasionally H.M. would live with defendant. He was not supportive of that plan and reported his concerns to the Division caseworker. H.M. testified at trial that Peter was "still a kid" and "not reliable." The Division nevertheless explored Peter as a parenting option and referred him to parenting classes, but he did not complete the program.

In addition, the Division referred defendant and Peter for drug testing; in March 2014 they both tested positive for marijuana which resulted in a referral for substance abuse evaluations. Defendant's evaluator recommended only mental health services, not substance abuse treatment, and in February 2016 she tested negative for drugs.

Peter's drug use was persistent. He had undergone outpatient drug treatment before moving in with his mother in 2014, and he continued to test positive after the Division's March 2014 test.

Peter was resistant to further testing and treatment. Ultimately, Peter underwent a substance abuse evaluation in July 2014, and he was referred to an outpatient drug treatment program. He did not attend the program, however, and was discharged as non-compliant. Peter was evaluated again in February 2015. He tested positive, was referred to an outpatient drug treatment, and again he did not attend.

Peter testified at trial that he continued to use drugs, but he expressed a willingness to undergo drug treatment. At the same time, he felt "like all the pressure's on me." He did not want to be the reason his sister was not returned to his mother. However, Peter denied that his mother needed any assistance in caring for Terri, and he did not believe that his using marijuana affected his ability to care for his sister.

The Division presented testimony from psychologist Ronald S. Gruen, Ed.D., who performed a psychological evaluation of defendant, and a bonding evaluation of defendant and Terri in December 2015. He concluded that defendant suffered from serious medical, emotional, and psychological problems that rendered her unable to parent her daughter, and her situation was unlikely to change. Dr. Gruen believed that Terri would be at risk if placed in defendant's care.

As for bonding, the expert concluded that defendant had an

"acquaintanceship relationship" with her daughter, with Terri viewing defendant as a playmate as opposed to a caregiver. Dr. Gruen found a "mild attachment" between defendant and Terri, but no significant psychological bonding. Thus, he opined that "permanent separation of mother and child would not cause [Terri] significant and enduring psychological harm."

Dr. Gruen also performed a bonding evaluation between Terri and her resource parent. He found a secure attachment and a strong psychological bond had developed over the years between Terri and Ruth. He further opined that disruption of Terri's psychological bond with Ruth would cause the child enduring emotional harm. He recommended that defendant's parental rights be terminated, and he "strongly endors[ed]" Ruth's adoption of Terri. Dr. Gruen testified that permanency was important for the child, and if she were kept "in limbo" it would lead "to high levels of anxiety."

In response to defendant's testimony that Terri had a positive relationship with her two brothers, Dr. Gruen testified that it was more important and in her best interests, for Terri to maintain her parental relationship with Ruth over her playmate relationships with her siblings.

The Law Guardian presented its expert, psychologist Alan J. Lee, Psy.D., who also performed a psychological evaluation of defendant, as well as bonding evaluations between defendant and

Terri, and Ruth and Terri.

Dr. Lee diagnosed defendant with depressive disorder, anxiety disorder, impulse control disorder, and a personality disorder with antisocial, narcissistic, and avoidant traits. He also could not rule out posttraumatic stress disorder or organic mental disorder. Based upon his psychological evaluation, he concluded that defendant was unable to provide minimally adequate parenting to Terri at the present time or within the foreseeable future, and her prognosis for significant and lasting changes was poor.

Based upon Dr. Lee's bonding evaluations, he concluded that Terri "has an insecure, ambivalent, and detached relationship with [defendant]," and "there is a low risk of the child suffering severe and enduring psychological or emotional harm if her relationship with [defendant] is permanently ended." By contrast, he opined that Terri "has a significant and positive psychological attachment and bond with . . . [Ruth]," and "there is a significant risk of [Terri] suffering severe and enduring psychological and emotional harm if her relationship with . . . [Ruth] is permanently ended."

Ultimately, the expert recommended a permanency plan for Terri that did not involve reunification with defendant, but instead adoption by Ruth. Dr. Lee testified to the importance of Terri having permanency with a consistent, stable, nurturing

caregiver and that adoption would provide that permanency for her.

Dr. Lee concurred with Dr. Gruen that it would be more damaging to Terri to lose her relationship with Ruth than to lose her relationships with her biological siblings.

In support of her case, defendant presented expert testimony from a psychologist, Andrew Brown, Ph.D., who rendered psychological evaluations of defendant in 2013 and 2015, and also performed bonding evaluations between Terri and defendant, and Terri and Ruth.

Dr. Brown found that in the intervening years between his evaluations of defendant, she had suffered a significant deterioration in her mental health. He concluded that as a result of her psychological issues, defendant was unable to safely parent her daughter, and she required sustained individual psychotherapy to address anxiety, mood, and self-esteem issues.

In addressing bonding, Dr. Brown found that Terri had a secure bond with both defendant and Ruth, and she viewed Ruth as her psychological parent. In reaching his conclusion about defendant's bond with Terri, however, he relied in part upon incorrect information that defendant had been the child's primary caregiver in the first six months of her life.

Given the results of his bonding assessment, the psychologist concluded that forced permanent separation of Terri from either

defendant or Ruth would cause the child irreparable and enduring psychological harm and trauma. He therefore opined that it was in Terri's best interests to pursue a kinship legal guardianship (KLG), as opposed to termination of defendant's parental rights.

Dr. Brown further testified that Ruth had advised him that she was amenable to Terri continuing contact with defendant even after adoption; if this were the case, the expert opined that Terri would not suffer harm from a termination of her mother's rights. He was concerned however, that Ruth's assurances of continued contact between child and biological mother could not be enforced if there were a termination of parental rights followed by adoption.

On May 9, 2016, Judge Patricia Richmond rendered a thorough oral decision. The judge found "much of [defendant's] testimony and many of the contentions and positions that she has taken are inherently not believable, do not deserve to have much credibility assigned to them and demonstrated clear lack of judgment." In a comprehensive assessment of the evidence presented, the judge found that the Division had sustained its burden of proving the elements of N.J.S.A. 30:4C-15(a) by clear and convincing evidence. She stated:

> This child, [Terri], should not have her life
> on hold while the Court waits to learn if and
> when [defendant] can become a reliable parent.

She has not demonstrated her ability to do so since 1996 and the experts have said she is not able to do so . . . in the foreseeable future. And [Terri] simply does not have time to wait to see what happens.

The judge determined that the child's best interests required the termination of defendant's parental rights and a judgment of guardianship was entered.

Defendant argues on appeal that the judge erred in concluding that the Division satisfied its burden of proof on the third and fourth prongs of the statutory best interests of the child test under N.J.S.A. 30:4C-15.1(a)(3)and (4).[4]

N.J.S.A. 30:4C-15.1(a) authorizes the Division to petition for the termination of parental rights in the "best interests of the child" if the following standards are met:

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's

_____

[4] The Law Guardian joins the Division in opposing the appeal.

placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

"Our review of a trial judge's decision to terminate parental rights is limited." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974)). Moreover, "[b]ecause of the family courts' special jurisdiction and expertise in family matters," we accord even greater deference to the judge's fact finding. N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (alteration in original) (quoting Cesare, supra, 154 N.J. at 413). Unless the trial judge's factual findings are "so wide of the mark that a mistake must have been made," they should not be disturbed, even if the reviewing court would not have made the same decision. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div.), certif. denied, 117 N.J. 165 (1989)).

Defendant contends that the Division did not meet its burden to prove prongs three and four of the statute by credible evidence. She asserts that although the Division did provide her with adequate services,[5] the court did not fully consider under prong three any alternatives to the termination of parental rights such as a KLG placement with Linda so that Terri might be raised with Ralph or a placement with defendant where Peter could assist with raising his sister.

We are satisfied that Judge Richmond supported her conclusion with credible evidence that the Division investigated and reasonably ruled out alternate placements of the child, including a proposed placement with Linda.

A KLG was correctly rejected because adoption was both feasible and likely, as Ruth had unequivocally declared her desire to adopt Terri. N.J.S.A. 3B:12A-6(d)(3); see N.J. Div. of Youth & Family Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011) (affirming that if adoption is available, KLG cannot be used to defend against termination of parental rights).

Judge Richmond also reasonably rejected placement with defendant, with Peter assisting her in raising Terri, given Peter's failure to complete parenting classes and drug treatment, and his

---

[5] The judge found the efforts of the Division to reunify defendant with the child were "extraordinary."

continued use of drugs. The court reasonably concluded that Peter lacked the maturity and judgment to serve as a parent or caretaker to his sister.

Finally, the court reasonably rejected placement with Linda. Notably, the Division attempted a placement with Linda when Terri was an infant. Linda rejected that placement because it would have meant disrupting other children in her home. In the intervening years, Terri became closely bonded with her resource parent, and she developed no relationship with Linda. Thus, based upon the totality of the evidence, including the testimony from Drs. Gruen and Lee, the court reasonably concluded that disrupting Terri's placement with Ruth would cause the child severe and enduring harm.

In arguing that the Division failed to satisfy the requirements of the fourth prong of the statute, defendant contends that the judge did not properly assess her relationship with Terri or Terri's relationship with her biological siblings when she concluded that termination of parental rights was in the child's best interests. We disagree.

We are mindful that while the law recognizes the importance of sibling relationships, there is no requirement that children be placed with them. Rather, the court must consider what is in the child's best interests, under the circumstances presented. In

re C.R., 364 N.J. Super. 263, 277-78 (App. Div. 2003), certif. denied, 179 N.J. 369 (2004). See also N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 82 (App. Div. 2013) ("[A]lthough the Division has a statutory duty to evaluate relatives as potential caretakers, there is no presumption favoring the placement of a child with such relatives."), certif. denied, 217 N.J. 587 (2014).

Contrary to defendant's argument, the judge considered the relationship between Terri and her siblings. She also noted, and accepted, the opinions of Drs. Gruen and Lee that it would not harm Terri to lose contact with her siblings. Dr. Gruen noted that Terri had very limited contact with Ralph, and although there was "some bond with [Peter], it's not a close and emotional one."

The judge also addressed Dr. Brown's opinion in which he advocated that parental rights not be terminated but also stated Terri could not be returned to and parented by defendant. She noted that the expert based his opinion in part on the strong bond he found between defendant and Terri which he explained had formed because defendant was the child's primary caregiver for the first six or seven months of her life. This was factually incorrect. As a result, the judge found Dr. Brown's opinion on this issue lacked credibility.

The court's decision to reject the bonding opinion of Dr.

Brown and accept the testimony of the other experts that there was not a strong maternal bond is entitled to our deference. See N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012); see also In re Guardianship of D.M.H., 161 N.J. 365, 382 (1999).

Additionally, Dr. Brown opined that the court should consider KLG. When questioned as to his understanding of the law that requires that if adoption is feasible, a KLG is unavailable, he stated that he knew the law but still thought KLG was the proper remedy here. In addressing this statement, the judge stated:

> We expect expert witnesses [who] come to court to understand what the legal standards are. . . . So Dr. Brown either didn't know what the law of KLG was or he knew what it was and he ignored it. Under either of those scenarios, it leads me to find his opinion to be less than credible.

We conclude that Judge Richmond supported her findings that the Division proved all of the prongs by substantial credible evidence. The judge conducted a well-reasoned assessment of the evidence and thoroughly considered each prong of the statute. We affirm substantially for the thoughtful reasons set forth in her oral decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4065-15T1