58 A.3d 735

IN THE MATTER OF THE VETO BY GOVERNOR CHRIS CHRISTIE
OF THE MINUTES OF THE NEW JERSEY RACING COMMIS-
SION FROM THE JUNE 29, 2011 MEETING AND THE ALLOCA-
TION ACTION TAKEN AT THAT MEETING BY THE NEW
JERSEY RACING COMMISSION.

Superior Court of New Jersey
Appellate Division

Argued September 11, 2012—Decided December 7, 2012.

Before Judges MESSANO, LIHOTZ and OSTRER.

*Michael D. Schottland* and *Christina Vassiliou Harvey* argued the cause for appellant Thoroughbred Breeders' Association of New Jersey (*Lomurro, Davison, Eastman & Munoz, P.A.*, attorneys; *Mr. Schottland,* of counsel and on the brief; *Ms. Harvey,* on the brief).

*George N. Cohen,* Deputy Attorney General, argued the cause for respondents Governor Chris Christie and New Jersey Racing Commission (*Jeffrey S. Chiesa,* Attorney General, attorney; *Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Judith A. Nason,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

In this appeal, the Thoroughbred Breeders' Association of New Jersey (TBA) urges us to reverse Governor Chris Christie's veto of the minutes of the June 29, 2011 meeting of the New Jersey Racing Commission (the Commission), and remand to the Commission with instructions to reconsider distribution of $15 million to various stakeholders in New Jersey's horse racing and breeding industry. We set forth the Legislative and procedural history that led to this appeal.

On February 1, 2011, the Legislature enacted comprehensive legislation creating the Atlantic City Tourism District. *See L.* 2011, *c.* 18, § 1, now codified as *N.J.S.A.* 5:12–218 to –233. *N.J.S.A.* 5:12–223 specifically required: "the Division of Gaming Enforcement ... [to] determine the amount of cost savings effected by the reduction in fees paid by casino licensees"; the Commission, thereafter, to determine an amount, not to exceed $15 million for the first fiscal year, to be collected by the Casino Redevelopment Authority (CRDA) from these savings; and the CRDA to allocate that amount to the Commission "to support ... the horse racing industry in this State through the augmentation of purses." *Ibid.* The statute further provided:

The amount of any funds authorized in this section to be collected and allocated in support of horse racing through the augmentation of purses shall be established by

the ... Commission at a regular meeting ... held during the fiscal year in which any such payment is authorized, which amount shall be reflected in the meeting minutes delivered ... to the Governor ... in the manner provided under [*N.J.S.A.* 5:5–22.1].

[*Ibid.*]

*N.J.S.A.* 5:5–22.1, enacted by the Legislature in 2001, remained unchanged and provides:

A true copy of the minutes of every meeting of the commission shall be forthwith delivered ... to the Governor. No action taken at such meeting of the commission shall have force and effect until the earlier of 10 days ... after such copy of the minutes shall have been so delivered, or the approval thereof by the Governor. If, in the 10–day period, the Governor returns such copy of the minutes with veto of any action taken by the commission ... at such meeting, such action shall be null and void and of no effect.

On May 16, 2011, the Commission solicited "written submissions from all permit holders and horsemen's organizations ... on the amount of monies the Commission should consider for the augmentation of purses in the current fiscal year."

The Standardbred Breeders and Owners Association of New Jersey (SBOA) stated it would "remain respectfully silent," because, based upon ongoing negotiations to lease the Meadowlands racetrack to a private investor, "we all agreed not to ask for the supplement to purses." However, the SBOA also stated that, "if the Commission d[id] decide to allocate any such monies, the SBOA ... [should be] treated fairly and an equitable split ... be made between Freehold and the Meadowlands."

The Thoroughbred Horsemen's Association (THA) sought $10 million for the "New Jersey Bred program[ ] and an unspecified amount to enhance purses at Monmouth Park." The THA, however, later revised its submission and asked that the Commission not allocate any subsidies in 2011. The THA stated that as a participant in negotiations for the lease of Monmouth Park racetrack, it agreed "to support the Governor's position that no money should be received by the Industry this year." Nonetheless, the THA further wrote that "if ... the Commission decide[d] to allocate any portion of the Purse Supplement," $7.5 million dollars should be distributed equally to Monmouth Park, the Meadowlands and the Atlantic City Race Course.

Appellant TBA requested $10 million "to augment purses for New Jersey-bred horses." The Atlantic City Race Course requested $800,000 to augment its purses, and Freehold Raceway requested $1,875,000 "to increase purses." On June 13, the New Jersey Sports and Exposition Authority (NJSEA) advised the Commission:

In an effort to create a self-sustaining course for the horse racing industry, the NJSEA has been negotiating with private individuals to shift track operations at both the Meadowlands and Monmouth Park from the State to the private sector....

The agreements have been structured in a manner to eliminate the need for purse subsidies of any kind and all parties to the negotiations have operated with the understanding that no such purse subsidies would be made available....

Based upon the parameters of the agreements that have been reached in principle, and the fact that all material participants have been operating with the knowledge that the State would not provide for purse subsidies in any way, ... the NJSEA believes that the ... Commission should not provide for any allocation of these funds.

At its meeting of June 29, the Commission unanimously agreed:

$15 million was needed for the racing industry and ... propose[d] a distribution method that divide[d] the money equally between the two breeds and distribute[d] the thoroughbred money as follows: $2.5 million to Atlantic City Race Course, $2.5 million to the permit holder at Monmouth Park and $2.5 million to the thoroughbred permit holder at the Meadowlands [and][t]he standardbred money w[ould] be distributed ... as follows: $2.5 million to the permit holder at Freehold Raceway and $5 million to the harness permit holder at the Meadowlands.

This distribution plan was formally included in the Commission's minutes which were delivered to the Governor on June 30, 2011.

The Governor vetoed the minutes on July 1. He stated that the Commission's decision "contradict[ed] and jeopardize[d] [the] stated goal of creating a self-sustaining course for the horse racing industry, which culminated in the recent agreements with private individuals to shift track operations at both the Meadowlands Racetrack and Monmouth Park from the State to the private sector." The Governor further explained "[t]hese efforts ... ha[d] been undertaken with the understanding that no such purse subsidies would be made available." The Governor also stated: "the manner in which the Commissioners distributed the ... subsidies defie[d] reason and logic[,]" the "haphazard allocations of

purse monies [were] not supported by any evidence in the record ... [and] part of the allocation ... award[ed] state subsidies to groups that did not request money."

On appeal, TBA argues that: the Governor's veto pursuant to *N.J.S.A.* 5:5–22.1 was unconstitutional; alternatively, even if the veto was constitutional, the Governor's decision was arbitrary and capricious; and the Commission's decision was itself arbitrary and capricious because it provided no funds for the thoroughbred breeding industry. We have considered these arguments in light of the record and applicable legal standards. We affirm.

I.

The TBA's constitutional challenge is multi-faceted. First, the TBA contends that the Governor's veto "circumvented the Legislature's delegation" of power to the Commission to appropriate funds to the horseracing industry for the augmentation of purses, and the statutory scheme "fails to provide for a legislative override of the Governor's veto as required by the State Constitution."

"The framers of the 1947 Constitution distributed powers among the three branches of State Government in a fashion that recognizes both the need for, on the one hand, primacy and clarity of governmental functions, but also, on the other hand, the importance of inter-branch accommodation." *Commc'ns Workers of Am., AFL–CIO v. Christie*, 413 *N.J.Super.* 229, 256, 994 *A.*2d 545 (App.Div.2010).

> In some instances, a branch of government may delegate certain of its powers to another branch. Or a branch may deliberately and definitively choose to share some of its power with another branch. In such circumstances, the delegation or sharing of constitutional power ordinarily will be upheld.
>
> [*Id.* at 257, 994 *A.*2d 545 (citations omitted).]

"[W]hen the Governor is acting consistently with express or implied authority from the Legislature, his or her action should be given the widest latitude of judicial interpretation, and the burden of persuasion ... rest[s] heavily upon any who might attack it." *Perth Amboy Bd. of Educ. v. Christie*, 413 *N.J.Super.* 590, 601,

997 *A.*2d 262 (App.Div.2010) (quotations omitted). "Only when the challenged action impairs the essential integrity of another branch will a court step in to enforce the constitutional boundaries." *Bullet Hole, Inc. v. Dunbar*, 335 *N.J.Super.* 562, 574, 763 *A.*2d 295 (App.Div.2000) (quotation marks and citation omitted).

In this case, the Legislature expressly required the CRDA to provide funds as directed by the Commission for the purpose of supporting "the horse racing industry ... through the augmentation of purses." *N.J.S.A.* 5:12–223. At the same time, however, the Legislature required that the "amount of any funds authorized" by the Commission "be established ... at a regular meeting" and the minutes of that meeting be "delivered ... to the Governor ... in the manner provided under [*N.J.S.A.* 5:5–22.1]." *Ibid.* The Legislature decided not to amend *N.J.S.A.* 5:5–22.1, but, rather, left unchanged the Governor's authority to veto the minutes, the result of which renders any action taken at the meeting "null and void and of no effect." *N.J.S.A.* 5:5–22.1. When read together, the express language of these statutes anticipates that the Commission could allocate monies intended to augment purses, but the Governor could nullify the action.

"It is not the function of [a] [c]ourt to 'rewrite a plainly-written enactment of the Legislature [ ]or presume that the Legislature intended something other than that expressed by way of the plain language.' " *DiProspero v. Penn.*, 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) (quoting *O'Connell v. State*, 171 *N.J.* 484, 488, 795 *A.*2d 857 (2002)). In attempting to discern legislative intent, we must consider the entire statutory scheme. *Perth Amboy Bd. of Educ., supra*, 413 *N.J.Super.* at 602, 997 *A.*2d 262. When a statute is plainly-written and unambiguous, "it is not [our] task to decide whether a statute duly adopted by the Legislature is wise." *In re Young*, 202 *N.J.* 50, 73, 995 *A.*2d 826 (2010) (Rivera–Soto, J., dissenting). In short, applying these well-known axioms of statutory construction, the Governor's exercise of his veto power was not "in derogation of the Legislature's will." *Perth Amboy Bd. of Educ., supra*, 413 *N.J.Super.* at 607, 997 *A.*2d 262.

We realize that in this case, the statutory scheme produced an ostensibly inconsistent result, i.e., the Legislature intended that CRDA monies be specifically used at the Commission's direction *to* augment purse money, and the Governor's veto evidenced his desire *not to* augment purse money at all. The TBA argues that this inconsistency implies the Legislature's preservation of the Governor's veto power was intended to permit only the veto of the amount of allocations made, not the veto of all monies designated for purse augmentation. We are not persuaded that this potential for inconsistency requires our intervention, i.e., that we construe the statutes contrary to their unambiguous terms.

■ "The Legislature is presumed to be thoroughly conversant with its own legislation." *State v. Galicia*, 210 *N.J.* 364, 381, 45 *A.*3d 310 (2012) (internal quotation marks and citations omitted). In this case, however, we need not presume such familiarity because the Legislature specifically referred to *N.J.S.A.* 5:5–22.1 when enacting *N.J.S.A.* 5:12–223. Because the Legislature specifically referred to, and chose not to amend, *N.J.S.A.* 5:5–22.1 when it enacted *N.J.S.A.* 5:12–223, there is no conflict between the two statutes and no implication that the legislative intent was contrary to the plain language of the statutes. *See, e.g., Brewer v. Porch,* 53 *N.J.* 167, 173, 249 *A.*2d 388 (1969) (discussing the concept of "implied repealers" "when a later expression of legislative will is so clearly in conflict with an earlier statute on the same subject that the two cannot reasonably stand together").

■ Additionally, if the Legislature intended to circumscribe the Governor's veto power in any way, it would have known how to effectuate its purpose. *See Zabilowicz v. Kelsey,* 200 *N.J.* 507, 517, 984 *A.*2d 872 (2009) ("The Legislature knows how to draft a statute to achieve that result when it wishes to do so."). Lastly, any apparent inconsistency between the result of executive action otherwise authorized by the Legislature, and an express statutory provision, does not compel the conclusion that the executive action is unconstitutional. *See Perth Amboy Bd. of Educ., supra,* 413 *N.J.Super.* at 606–07, 997 *A.*2d 262 (concluding an executive order

transferring reserve funds to offset reductions in State aid did not violate the separation of powers doctrine despite statutory language that "excess undesignated general fund balances shall be reserved and designated in the subsequent year's budget").

The TBA also argues that the veto power preserved by *N.J.S.A.* 5:5–22.1 is per se unconstitutional because it fails to provide for any legislative override. The argument lacks sufficient merit to warrant extensive discussion. *R.* 2:11–3(e)(1)(E). We add only the following.

■ Our Constitution defines the veto powers of the Governor regarding any legislative enactment. *N.J. Const.,* art. V, § 1, ¶ 14. Additionally, the Governor is authorized to exercise line item vetoes in any appropriation bill. *N.J. Const.,* art. V, § 1, ¶ 15. However, the veto power exercised in this case does not spring from either of those constitutional provisions. Rather, the Governor's veto of the Commission's minutes was exercised pursuant to an express legislative grant of that power, something accorded to the Governor by the Legislature in literally dozens of other situations. *See, e.g., N.J.S.A.* 13:18A–5 (granting the Governor veto power over the minutes of the Pinelands Commission); *N.J.S.A.* 5:9–9 (same regarding the State Lottery Commission).

Finally, the TBA argues that the Governor's veto was unconstitutional because the Commission is a division of the Department of Law and Public Safety (DLPS), of which the Attorney General is the head. *See N.J.S.A.* 52:17B–2. Because the Attorney General occupies a unique position in the executive branch, the TBA contends that only he had the power to veto the Commission's minutes, and the delegation of this power to the Governor was unconstitutional. We again disagree.

We start with some basic principles. All executive power in New Jersey resides with the Governor. *See N.J. Const.* art. V, § 1, ¶ 1 ("The executive power shall be vested in a Governor."). The 1947 Constitution intentionally strengthened the power of the Governor. *Perth Amboy Bd. of Educ., supra,* 413 *N.J.Super.* at

599, 997 *A.2d* 262 (citing *Kenny v. Byrne*, 144 *N.J.Super.* 243, 251, 365 *A.2d* 211 (App.Div.1976), *aff'd o.b.*, 75 *N.J.* 458, 383 *A.2d* 428 (1978)). The Constitution also provides:

> All executive and administrative offices, departments, and instrumentalities of the State government, *including the offices of Secretary of State and Attorney General*, and their respective functions, powers and duties, *shall be allocated by law among and within not more than twenty principal departments*, in such manner as to group the same according to major purposes so far as practicable. [*N.J. Const.* art. V, § 4, ¶ 1 (emphasis added).]

"Each principal department shall be under the supervision of the Governor." *N.J. Const.* art. V, § 4, ¶ 2. DLPS is one such department "established in the executive branch." *N.J.S.A.* 52:17B–1. In 1970, the Legislature transferred the Commission from the Department of the Treasury to DLPS and constituted the Commission as a division of that department. *See L.* 1970, *c.* 18, § 1 (now codified as *N.J.S.A.* 52:17B–95).

The TBA relies upon our recent decision in *In re Plan for Abolition of Council on Affordable Housing*, 424 *N.J.Super.* 410, 38 *A.3d* 620 (App.Div.), *certif. granted*, 211 *N.J.* 274, 48 *A.3d* 355 (2012), where we considered the limits of executive authority over a legislatively-created State agency, the Council on Affordable Housing (COAH). Specifically we were asked to decide whether the Governor could abolish COAH and "transfer the duties, responsibilities and obligations of that agency to the sole authority of the Commissioner of the Department of Community Affairs (DCA)" pursuant to the Executive Reorganization Act of 1969, *N.J.S.A.* 52:14C–1 to –11. *Id.* at 412, 38 *A.3d* 620.

We examined the specific language adopted by the Legislature when it created COAH, i.e., "[t]here is established *in, but not of,* the Department of Community Affairs a Council on Affordable Housing. . . ." *Id.* at 413, 38 *A.3d* 620 (quoting *N.J.S.A.* 52:27D–305). We further noted that "[t]his 'in but not of' language is the most common means of identifying those agencies that the Legislature intended to be independent and outside the scope of Executive control . . . while also abiding by the constitutional mandate allocating every agency, independent or otherwise, to an estab-

lished department in the Executive Branch." *Id.* at 424, 38 *A.*3d 620. Based upon this, and other provisions of COAH's statutory framework, we held that the Governor did not have "the power to abolish a legislatively created, representative, independent author- ity that is 'in but not of' the Executive Branch or any department in that branch of the government." *Id.* at 412, 38 *A.*3d 620.

In this case, however, the relevant statutory language does not support the conclusion that the Legislature intended the Commission "to be independent and outside the scope of Execu- tive control." *Id.* at 424, 38 *A.*3d 620. Quite the opposite is true.

*N.J.S.A.* 5:5–22 provides:

> There is hereby created and established a New Jersey Racing Commission ... which ... shall be vested with and possessed of the powers and duties ... specified, including the duty, when consistent with the commission's primary duty of regulating horse racing, to advocate the growth, development and promotion of the horse racing industry in this State, and also the powers necessary or proper to enable it to carry out fully and effectually all the provisions and purposes of this act.

The Legislature subsequently enacted *N.J.S.A.* 52:17B–95, which provided:

> The ... Commission ... is continued and transferred and constituted the Division of the New Jersey Racing Commission *in the Department of Law and Public Safety.*
>
> [ (Emphasis added).]

Neither statute reflects an intention to imbue the Commission with some independence from control by the executive branch. By enacting *N.J.S.A.* 5:5–22.1, the Legislature clearly intended to provide the Governor with direct executive control because it provided him with authority to veto the Commission's minutes, thereby nullifying any of its actions.

The TBA, however, argues that, despite the clear legislative mandate of *N.J.S.A.* 5:5–22.1, such control can only be exercised constitutionally by the Attorney General. We reject that conten- tion.

The Attorney General is a constitutional officer within the executive branch, *N.J. Const.,* art. V, § 4, ¶ 1, who is appointed by

the Governor with the advice and consent of the Senate. *N.J. Const.,* art. V, § 4, ¶ 3. Unlike other department heads, however, the Attorney General does not serve at the pleasure of the Governor, but rather serves a term that is co-existent with the Governor. *Ibid.; see Morss v. Forbes,* 24 *N.J.* 341, 369, 132 *A.*2d 1 (1957).

Despite this somewhat unique constitutional status, it has long-been recognized that "in the absence of constitutional limitations, [the Attorney General's functions] are subject to increase, alteration or abridgment by legislative enactment." *Wilentz v. Hendrickson,* 133 *N.J. Eq.* 447, 455, 33 *A.*2d 366 (Ch.1943), *aff'd,* 135 *N.J. Eq.* 244, 38 *A.*2d 199 (E. & A.1944). One telling example of the permissible extent of Legislative delineation of the Attorney General's functions can be found in *N.J.S.A.* 52:17B–4, which provides that the Attorney General shall "[p]erform such other functions and duties as the Governor may prescribe."

In sum, we see no constitutional limitation upon the Legislature's decision to accord the Governor, not the Attorney General, veto power regarding the Commission's minutes. We therefore reject the TBA's constitutional challenge to the Governor's veto.

## II.

We address the other issues raised by the TBA. It contends that even if the Governor's veto was constitutional, we should reverse because the Governor's action was mistakenly based upon the conclusion that the Commission awarded some stakeholders monies even though they never made a request. Because the decision was unsupported by the facts before the Commission, the TBA argues the Governor's action should be set aside as arbitrary, capricious and unreasonable.

We are authorized by the Constitution to review executive agency action. *See In re Senior Appeals Exam'rs,* 60 *N.J.* 356, 363, 290 *A.*2d 129 (1972) ("[J]udicial review of administrative agency determinations has the support of a special constitutional

provision (*art.* VI, *sec.* 5, *para.* 4) which largely immunizes it from legislative curbs."). But, our review is circumscribed, lest we violate the Constitution's separation of powers. *See Texter v. Dep't of Human Servs.*, 88 *N.J.* 376, 382–83, 443 *A.*2d 178 (1982) ("This limited review prevents the courts from usurping policy decisions from other branches of government.") (citing *Newark v. Natural Res. Counc. Dept. of Envtl. Prot.*, 82 *N.J.* 530, 542, 414 *A.*2d 1304 (1980)).

 The standard of review that we apply to agency action recognizes this limited power. "Unless a Court finds that the agency's action was arbitrary, capricious, or unreasonable, the agency's ruling should not be disturbed." *Brady v. Bd. of Review*, 152 *N.J.* 197, 210, 704 *A.*2d 547 (1997).

> Under that standard, the scope of judicial review of an agency's decision is restricted to four inquiries: (1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors. [*In re Taylor*, 158 *N.J.* 644, 656, 731 *A.*2d 35 (1999) (citations omitted).]

As we recently noted in *Vas v. Roberts*, 418 *N.J.Super.* 509, 516, 14 *A.*3d 766 (App.Div.2011), *Rule* 2:2–3(a)(2) provides the right for our "review [of] final decisions or actions of any state administrative agency or officer," and "the Governor is the State's chief executive or administrative officer." *Vas, supra,* 418 *N.J.Super.* at 519, 14 *A.*3d 766. Indeed, we have frequently exercised our jurisdiction to review actions taken directly by the Governor, as opposed to executive action taken by or through an administrative agency. *See, e.g., In re Plan for Abolition of Council on Affordable Hous., supra,* 424 *N.J.Super.* at 412, 38 *A.*3d 620 (whether Governor's executive order violated statute); *Perth Amboy Bd. of Educ., supra,* 413 *N.J.Super.* at 593, 997 *A.*2d 262 (same); *Commc'ns Workers of Am., supra,* 413 *N.J.Super.* at 234–35, 994 *A.*2d 545 (whether Governor's executive order violated statutes and was an unconstitutional impairment of contract rights); *Bullet Hole, supra,* 335 *N.J.Super.* at 566, 763 *A.*2d 295 (challenge to

Governor's designation of the State Police as contact point for processing background checks pursuant to federal law); *Dalton v. Kean*, 213 *N.J.Super.* 572, 574, 517 *A.*2d 1224 (App.Div.1986) (whether Governor's reorganization plan violated statute), *certif. denied*, 107 *N.J.* 110, 526 *A.*2d 181 (1987).

However, in each of those cases, we examined the Governor's actions only in light of Constitutional and statutory grants or limitations of his authority. In other words, we reviewed the executive action under the first two "inquiries" set forth above. We specifically did not address the third and fourth inquiries; that is, in all the cases cited, our review did not inquire as to whether the Governor's decision was supported by substantial evidence, and whether the conclusions reached upon those facts were consonant with reason and the legislative grant of authority. In short, we did not apply the usual standard of review—whether the Governor's decision was arbitrary, capricious or unreasonable. The TBA has cited no case, and our independent research has not revealed one, in which a court has applied the arbitrary, capricious or unreasonable standard of review to the discretionary actions of a Governor.

In this case, the Legislature clearly provided the Governor with the power to veto any action taken by the Commission. For reasons already discussed, the Governor's veto "did not offend[ ]" the Constitution nor did it "violate[ ] express or implied legislative policies." *Taylor, supra*, 158 *N.J.* at 656, 731 *A.*2d 35. The Legislature did not impose restrictions upon the Governor's use of the veto power, require that he explain his reasons for exercising the power accorded and otherwise did not inhibit the Governor's discretionary decision-making.

Under this legislative scheme, if we were to consider whether the Governor's stated reasons for exercising his veto were supported by substantial evidence, or whether his conclusions were reasonably reached based upon that evidence, *ibid.*, we would tread dangerously close to the boundary line separating our Constitutional power to review executive action, and the statutory

and constitutional power accorded another co-equal branch of government. In our view, consideration of whether the Governor's veto of the Commission's minutes was factually sound or good policy "presents a non[-] justiciable political question," and can play no part in our review. *Gilbert v. Gladden*, 87 *N.J.* 275, 282, 432 *A.*2d 1351 (1981). A non[-] justiciable political question arises when there is "a lack of judicially discoverable and manageable standards for resolving it," or the issue is impossible to "decide[e] without an initial policy determination of a kind clearly for nonjudicial discretion." *Ibid.* (quoting *Baker v. Carr*, 369 *U.S.* 186, 217, 82 *S.Ct.* 691, 710, 7 *L.Ed.*2d 663, 686 (1962)).

Here, there were intricate and somewhat competing policy decisions at play. The record reflects ongoing negotiations between the NJSEA, the Governor's office and private individuals to take over operations at two New Jersey racing venues. Those negotiations included efforts to minimize the use of public monies in an effort to make the industry self-sustaining. The Legislature, although indicating support for purse augmentation, nevertheless provided the Governor with the ability to veto any decision made by the Commission. In our view, given the statutory framework, there are no "judicially discoverable and manageable standards for resolving" the differing policy implications, and any effort by the court to do so would be an exercise in "policy determination of a kind clearly for nonjudicial discretion." *Ibid.*

We hasten to add that our opinion should not be read too broadly. Perhaps a particular piece of legislation that placed reasonable and constitutional limits on the exercise of gubernatorial power through the application of well-defined standards would trigger application of our traditional standard of review. Because this is not such a case, we hazard no particular opinion on the issue.

In short, we reject the argument that the Governor's decision to veto the Commission's minutes was reviewable under our traditional "arbitrary, capricious or unreasonable" standard applicable to most executive agency actions.

Lastly, in light of our decision affirming the Governor's veto, we need not consider the third argument raised by the TBA, i.e., that the Commission's action was arbitrary, capricious and unreasonable because it made no award of money to the TBA.

Affirmed.