**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4847-12T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Appellant,

v.

K.N. and K.E.,

    Defendants-Respondents.

_____

IN THE MATTER OF T.E.,

    A minor.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| March 20, 2014 |
| APPELLATE DIVISION |

Submitted February 4, 2014 — Decided March 20, 2014

Before Judges Messano, Hayden and Rothstadt.

On appeal from the Superior Court of New
Jersey, Chancery Division, Family Part,
Ocean County, Docket No. FN-15-130-13.

John J. Hoffman, Acting Attorney General,
attorney for appellant (Melissa H. Raksa,
Assistant Attorney General, of counsel;
Stephanie Anatale, Deputy Attorney General,
on the brief).

Joseph E. Krakora, Public Defender, Law
Guardian, attorney for minor T.E. (Noel C.
Devlin, Assistant Deputy Public Defender, on
the brief).

Respondents K.N. and K.E. have not filed briefs.

The opinion of the court was delivered by

MESSANO, P.J.A.D.

By our leave granted, the Division of Child Protection and Permanency (the Division) appeals from those provisions of the June 10, 2013 order of the Family Part that, over the Division's objections, awarded physical custody of six-year-old T.E. (Tommy) to his "maternal grandmother as a paid resource placement," and denied the Division's request for psychological evaluations of Tommy's maternal grandparents, Charlotte and Carl H.[1] The litigation commenced on May 9, 2013, when the Division filed a verified complaint and order to show cause seeking care and supervision of Tommy pursuant to N.J.S.A. 30:4C-12. At the time, Tommy was in the "physical legal custody" of his mother K.N. (Kara), and both had resided in Carl and Charlotte's home for several months.

We need not set forth the contents of the Division's complaint at length, because they are largely irrelevant to the

---

[1] We have fictionalized the names of those involved to maintain their privacy. Carl is referred throughout the record interchangeably as the "maternal grandfather" and "maternal step-grandfather."

issues presented on appeal. However, to place the controversy in some context, we reference the more pertinent allegations.

Tommy was born in March 2007 to Kara and K.E. (Kevin). That year, upon receiving referrals of domestic violence between Kara and Kevin, and after Kara tested positive for marijuana and opiates, the Division filed an order to show cause and verified complaint in the Family Part. In November 2007, the court granted the Division custody of Tommy, who was placed "in a relative care home."[2] In November 2008, after Kara and Kevin actively participated in services, the litigation was terminated and the family reunited.

The Division continued to provide services, since Kara was participating in substance abuse counseling, and additional referrals were made in December 2009 and September 2011. In April and May 2012, the Division investigated allegations of domestic violence between Kara and Kevin, and that Kara had stolen prescription painkillers from her sister. Kara denied the allegations and agreed to visit the Division's office for urine screening. She failed to appear. During the balance of 2012 and into 2013, Kara and Kevin participated in separate drug and alcohol counseling programs, and the Division continued to monitor their progress.

---

[2] The record does not set forth with whom Tommy with placed.

During a February 2013 visit, the Division's caseworker was advised that Kara was sixteen weeks pregnant. After Kara failed to attend a substance abuse evaluation, the caseworker visited Carl and Charlotte's home on March 27, 2013. Carl reported that Kara, Kevin and Tommy had moved into their home, but after Kevin's continued verbal abuse of Kara, Carl told Kevin to leave. The entire family left for a few days but were evicted from a motel in Belmar for failing to pay their rent. Only Kara and Tommy returned to the H.'s home. Carl told the caseworker he had discovered that eighteen of his pain pills were missing and was concerned Kara had taken them.

During an April 1, 2013 visit, Tommy told the caseworker that Kara takes a pill "sometimes in the morning and at night." Tommy showed the caseworker where he kept his toys and said that Kara would sometime keep her pills there. Kara denied using any drugs and claimed Tommy was speaking of the pre-natal vitamins she was taking. However, on April 3, Kara tested positive for opiates. The Division's caseworker met with Carl and Charlotte and advised that Kara would need to be supervised whenever she was with Tommy. On April 9, Kara submitted another urine sample that was positive for opiates.

On May 10, 2013, the judge granted the Division's request and entered an order to show cause against Kara and Kevin,

returnable June 6. Although the Division sought an order placing Tommy in its "care and supervision," the Law Guardian apparently urged the judge to grant the Division custody.[3] The order provided that

> [Tommy] be immediately made a ward of the court and placed in the immediate custody, care and supervision of the Division with authorization for the Division to consent to routine and emergency surgical or medical treatment to safeguard the life or health of the child.

The order did not explicitly provide for Tommy's placement with Carl and Charlotte; however, later proceedings revealed that the Division agreed to this as an initial placement. At the time, Kara's sister and her four children were also living with Carl and Charlotte. The order further provided:

> [Kara] shall be permitted to reside with the maternal grandmother for [five] days (while DCPP has custody) so she can try to obtain in-patient treatment. If [Kara] needs more time[,] then counsel shall conference.
>
> [Kara] shall be supervised by the maternal grandmother on a [twenty-four] hour/[seven] day per week basis and the birth mother is not permitted to drive the child in a car.

On the return date of June 6, the Law Guardian immediately brought to the Court's attention that Tommy had been removed

---

[3] This was revealed in the transcript of the next proceeding on June 6.

from Carl and Charlotte's home by the Division and placed with his maternal great aunt, C.S. (Celeste). The Law Guardian reported that Tommy believed the removal was "his fault," and his behavior had changed as a result of leaving his mother, aunt, cousins and grandparents.

When the judge asked why the Division had removed Tommy, the Deputy Attorney General (DAG) directed the judge's attention to a "court report" dated May 29 that indicated Tommy "had to be moved due to [Carl] being on the perpetrator list" as the result of a "[domestic violence] incident where [Carl] held a gun to [Charlotte's] head." The judge, however, indicated that pursuant to N.J.S.A. 30:4C-26.8, licensure of a placement home could be withheld as the result of a criminal conviction, but "no one is convicted of domestic violence. . . . It's a civil proceeding . . . ." The judge directed court staff to ascertain the results of the prior domestic violence complaint against Carl and obtained a report that it had been dismissed.

The Law Guardian urged the judge to return Tommy to Carl and Charlotte, but the Division objected, noting that Kara had not entered an in-patient substance abuse counseling program and was still in the home. Kara indicated she would immediately vacate the home to facilitate Tommy's return. The judge entered an order that provided in part that Tommy would be returned to

Charlotte the following day, and that Kara would "vacate the . . . residence immediately[.]"

The next day, June 7, the judge held a hearing apparently in response to the Division's emergent request for reconsideration. The judge stated that the Division "removed a child from where the [c]ourt had placed [him] . . . without notice to the [c]ourt, Law Guardian or any defense counsel . . . . There was absolutely no due process . . . whatsoever." The judge further explained:

> [A] request was made today for the Court to revisit this. The Court denied that request. It made its decision regarding the placement of this child. It issued an order to that effect but, once again, we run into a situation where the Division does not agree with the Court's decision and has engaged, again, in a constant attacking of the Court's decision. The Court made its decision.
>
> All right. The Court denied a request for a rehearing today. Period.

The judge did, however, grant the Division's request for a hearing to stay the June 6 order. Noting that he wanted the parties to brief the issue, the judge asked rhetorically:

> And why does the Court want that? Because it just went through this with the Division in which many things were misrepresented to the Appellate Division in the context of the request for the stay.
>
> Also, because of the lack of due process that the Court is very concerned

with in this case, it will give the parties an opportunity to respond to the Division's submission on a request for a stay so that we can have an accurate [a]ppellate record in this case.

The judge also referenced an "amended court report" dated June 7. That report revealed that the Division substantiated a finding of neglect against Carl in 2004 stemming from a referral by the Family Part domestic violence judge. One of the victims of the neglect finding was Kara, who was present in the home when Carl displayed a gun and threatened Charlotte. The amended court report also indicated that Kara's sister, now living in the home with her children, had "current child endangerment charges" filed against her. Additionally, the report stated that Carl was "verbally hostile" towards the Division's caseworkers when Tommy was placed on May 10, initially refused to sign any of the documents in the "resource packet," had "swastika flags hanging in his office" and made racially derogatory remarks. However, the judge concluded:

> [T]here's nothing in this [amended] report that the [c]ourt feels is an imminent risk of harm to this child's health, safety or welfare such that the child should not be placed there as ordered by the [c]ourt since the child shouldn't have been removed in the first instance, particularly without a hearing or any due process being afforded any of the parties in this case, as well as the child who has rights.

The Division filed its formal motion for a stay, supported by a certification and attachments, including copies of the police report from the 2004 incident involving Carl. The report revealed that during a family argument, Carl retrieved a gun from his home office and threatened to kill Charlotte and other family members. Charlotte said that he had made similar threats in the past, but she never reported them to police.

The certification also included the Division's contact sheets detailing the May 10 placement. It suffices to say that the caseworkers claimed Carl was "verbally abusive" toward them in front of the children in the home and made racially derogatory remarks. When asked to review the resource placement materials and sign the case plan, Carl initially refused. The Division placed Tommy with Celeste on May 13. There is no indication in the record that the Division provided notice to anyone about Tommy's removal and placement with Celeste.

At the start of the hearing on the Division's request for a stay, the judge expressed his "hope that this would be taken up to a higher court for two legal issues to be resolved." He described those as: (1) "the treatment of domestic violence findings and how that pertains to the Division's ability to license a home"; and (2) "whether a substantiation, in and of

itself, would require the removal of a child because the Division could not license a home."

The court heard from Carl, who explained that his frustrations with the Division were directed solely at the process. He stated that he and Charlotte were currently raising four other grandchildren, who were loved and well-cared for. He wanted Tommy to be part of the family. Carl also explained that the swastika was a "souvenir[]" his father brought back from fighting "under General Patton in World War II." He admitted using a racially derogatory term in front of the workers, but stated that he did so only in the context of discussing "political correctness." The Division's caseworker provided some testimony in rebuttal.

The judge denied the Division's request for a stay, stating

> [T]he child should have never been removed in the first instance without hearing to all of the parties [and the court] disagrees that the home can't be licensed under the reasons stated by the Division. . . . [The court] finds no basis to grant the stay, which is denied . . . .

The judge refused the Division's request to order psychological evaluations of Carl and Charlotte, noting the substantiated neglect finding was "[n]ine years ago." The judge also refused the Division's request to include "language in the order that indicates . . . the placement . . . is not a paid placement."

The Division sought leave to appeal and a stay of the judge's order. The judge filed a written statement of reasons for his decision. R. 2:5-6(c). He noted that under New Jersey law, domestic violence proceedings were civil in nature; thus, there could be no "conviction" for domestic violence, and, hence, that could not be a basis for disqualification of Carl and Charlotte as resource family parents. The judge also noted that even if a resource family parent or household member was the subject of a substantiated finding of abuse or neglect, the Division could license the family if it determined there was no continuing risk of harm and licensure was in the child's best interests.

Although we granted the Division's motion for leave to appeal, we refused to stay the June 10 order.

I.

The Division contends that the judge did not have the authority to order Tommy's placement "in an unlicensed, dangerous home," or order the Division to "pay for the placement." The Division also argues that the judge "abused [his] discretion in enjoining [the Division] from obtaining evaluations of the proposed caregivers."

The Division's overarching contention is that the Legislature has granted to it alone the statutory and regulatory

authority to select appropriate placements and license them. The Division argues that the judge's decision in this case, therefore, violates the separation of powers clause of the State constitution. See N.J. Const., art. III, ¶ 1 ("The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.").

The Division concedes that the Family Part may exercise its jurisdiction and order a particular placement "as between two fit, licensed homes." See, e.g., In re C.R., 364 N.J. Super. 263, 283 (App. Div. 2003) (recognizing the court's jurisdiction to resolve disputes "between competing [permanency] plans that are reasonably plausible"), certif. denied, 179 N.J. 369 (2004). However, it argues that the Family Part cannot order a placement in a home which, in the reasonable, discretionary exercise of its statutory powers, the Division has determined is inappropriate. The Division argues that the sole remedy to its licensing decision is an administrative appeal brought by Carl and Charlotte.

The Law Guardian argues that whether Carl and Charlotte's home was a "reasonably plausible" placement required resolution

of disputed facts, and the judge's determination, based upon the evidence presented, should be entitled to our deference.[4]

We have considered these arguments in light of the record and applicable legal standards. We reverse and remand for further proceedings consistent with this opinion.

A.

We begin by reviewing the statutory and regulatory regime. "The Legislature has established the Division as 'the State agency for the care, custody, guardianship, maintenance and protection of children[.]'" N.J. Div. of Youth & Family Svcs. v. D.P., 422 N.J. Super. 583, 593 (App. Div. 2011) (quoting N.J.S.A. 30:4C-2(a)). "In that role, the Division is authorized to temporarily remove children from the home of their parents or guardians . . . when the child's best interests are not secured by their parents who are in need of services[.]" Ibid. (citing N.J.S.A. 30:4C-12).

The Division may accomplish this by "identif[ying] and approv[ing] a child's placement with a resource family to provide day-to-day care." Ibid.; and see N.J.S.A. 30:4C-26(a) ("Whenever the circumstances of a child are such that his needs cannot be adequately met in his own home, the division may

---

[4] Kara and Kevin did not file briefs.

effect his placement in a resource family home, <u>with or without payment of board</u> . . . .") (emphasis added). A "resource family parent" is any person "with whom a child in the care, custody or guardianship of the [Division] is placed . . . for care." <u>N.J.S.A.</u> 30:4C-27.1.[5] Resource family parents are entitled to notice of and a right to be heard at any court review or hearing involving the child. <u>N.J.S.A.</u> 30:4C-12.2; <u>and see</u> <u>D.P.</u>, <u>supra</u>, 422 <u>N.J. Super.</u> at 594 (noting this notice provision reflects the Legislature's recognition of "the vital role resource parents play[,] [p]articularly recognizing their superior knowledge of the child's physical and emotional status"); <u>N.J.S.A.</u> 9:6-8.19a (requiring notice to resource family parents of all proceedings brought under Title Nine).

In enacting the Resource Family Parent Licensing Act (RFPLA), <u>N.J.S.A.</u> 30:4C-27.3 to -27.15, the Legislature declared "it [was] in the public interest to license resource family parents and regulate resource family homes in order to ensure the safety, health and proper development of children placed in resource family care." <u>N.J.S.A.</u> 30:4C-27.4. Under the RFPLA, a "'[r]esource family parent' means a person who has been licensed . . . to provide resource family care . . . ." <u>N.J.S.A.</u> 30:4C-

---

[5] We have frequently substituted "the Division" for the Department of Children and Families (DCP) throughout our discussion of the statutory and regulatory scheme.

27.5. Therefore, "[a] person shall not provide resource family care to a child unless the person is licensed," and is "of good moral character." N.J.S.A. 30:4C-27.6(a),(c).

N.J.S.A. 30:4C-27.9 provides that a license may be denied "for good cause, including, but not limited to":

> a. . . . ;
>
> b. . . . ;
>
> c. The conviction of a[n] . . . applicant or any adult member of the . . . applicant's household of a crime enumerated under [N.J.S.A.] 30:4C-26.8);
>
> d. A determination that an incident of child abuse or neglect by a[n] . . . applicant or any adult member of the . . . applicant's household has been substantiated, except that the department may issue the license if the department determines that the . . . applicant or adult household member poses no continuing risk of harm to the child and the issuance of the license is in the child's best interests;
>
> . . . .
>
> i. Any conduct, engaged in or permitted, which adversely affects or presents a serious hazard to the education, health, safety, general well-being or physical, emotional and social development of the child residing in the resource family home, or which otherwise fails to comply with the standards required for the provision of resource family care to a child and the maintenance of a resource family home.
>
> [And see N.J.A.C. 10:122C-2.5(b).]

While the RFPLA seemingly leaves licensure to the discretion of the Division, subject to disqualification for "good cause," the Legislature spoke more emphatically elsewhere in Title 30. Thus, "[a] person shall be disqualified from being a resource family parent . . . if that person or any adult residing in that person's household" was convicted of any of several listed offenses, including "domestic violence pursuant to [N.J.S.A.] 2C:25-17 et seq." N.J.S.A. 30:4C-26.8(d)(9) (emphasis added); and see N.J.A.C. 10:122C-2.5(a) (same).

Before denying a license, the Division must notify the applicant and afford an "opportunity to be heard and . . . contest the department's action." N.J.S.A. 30:4C-27.10. Review of the Division's decision is by way of appeal to this court. N.J.S.A. 30:4C-27.11.

However, Title 30 contemplates that the Division may place a child with a relative who is not a resource family parent, nor wishes to become one. For example, under the Child Placement Review Act (the CPRA), N.J.S.A. 30:4C-50 to -65 (the CPRA), the definition of a "'[c]hild placed outside his home' . . . does not include a child placed by the court in the home of a person related to the child who does not receive any payment from the [D]ivision for the care of the child[.]" N.J.S.A. 30:4C-52(b). Under N.J.S.A. 30:4C-12.2, the right to notice of all hearings

involving a child in the Division's "care or custody" extends not just to the child's "resource family parent," but also to a "relative providing care for the chil[d]."  And see N.J.S.A. 30:4C-54 (requiring that written notice of proceedings following a voluntary placement agreement must be given to "the child's caretaker," whether "a resource family parent, preadoptive parent or relative") (emphasis added).

The distinction between placement with a relative and placement with a licensed resource family parent is made clear by N.J.S.A. 30:4C-12.1, Title Thirty's requirement that the Division first look to place a child with a relative.  That statute provides that once the Division accepts a child "in its care or custody, including placement," within thirty days it "shall initiate a search for relatives who may be willing and able to provide the care and support required by the child." N.J.S.A. 30:4C-12.1(a).  If after conducting an assessment of the "relative's ability to provide the care and support, including placement," ibid., the Division "determines that the relative is unwilling and unable to assume the care of the child," it must inform the relative of its determination. N.J.S.A. 30:4C-12.1(b).  Notably, one of the things the Division must tell the child's relative is "that termination of parental

rights may occur if the child remains <u>in resource family care</u> for more than six months[.]" <u>N.J.S.A.</u> 30:4C-12.1(b)(3).

Similar distinctions are implicit in Title Nine. For example, following a dispositional hearing, <u>see</u> <u>N.J.S.A.</u> 9:6-8.51, "the court <u>may place [a] child in the custody of a relative</u> or other suitable person or the division . . . ." <u>N.J.S.A.</u> 9:6-8.54(a) (emphasis added). As the Court has noted, "[a]lthough 'placement' is not defined in Title Nine, . . . the Legislature intended to include a non-custodial parent . . . as 'a relative or other suitable person' with whom the Division was authorized to place the child." <u>N.J. Div. of Youth & Family Servs. v. G.M.</u>, 198 <u>N.J.</u> 382, 403 (2009) (quoting <u>N.J.S.A.</u> 9:6-8.54(a)). <u>N.J.S.A.</u> 9:6-8.19a requires notice of all Title Nine proceedings be given to "the child's resource family parent <u>or</u> relative providing care for the child, as applicable[.]" (emphasis added).

We conclude that under both Title Nine and Title Thirty, the Legislature intended that the court have the authority to place a child with an appropriate relative, independent of any licensing decision made by the Division.

Under the broad authority conveyed by the Legislature in Title 30, the Division has adopted a comprehensive regulatory scheme governing the removal of a child after a placement is

made. For example, N.J.A.C. 10:122E-1.1 provides that "the Division has the discretionary authority to remove a child in placement from a resource family home at any time with or without the consent of the resource family parent, parent or child in placement." In emergent situations, "[t]he Division representative shall remove a child in placement from a resource family home when the Division determines that the child is not safe in the resource family home." N.J.A.C. 10:122E-2.1(a) (emphasis added).

In "non-emergency situations," the Division "may remove a child in placement" for a variety of reasons, including "documented evidence that the resource family engages in behavior[] which is detrimental to any child in placement in that resource family home." N.J.A.C. 10:122E-2.2(a)(3) (emphasis added). Prior to a non-emergent removal, the Division "shall" conduct interviews of the child and the resource family parent and shall also inform the child, the resource family parent and the parent "at least [thirty] days prior" to the removal, "or as soon as possible when a court order is being followed." N.J.A.C. 10:122E-2.3(a) and (b).

Whether in an "emergency [or] non-emergency situation[]," the Division "shall consider" a variety of "points when deciding whether to remove a child in placement." N.J.A.C. 10:122E-

2.5(a). One of these is "[t]he resource family's history with the Division . . . ." N.J.A.C. 10:122E-2.5(a)(7).

When a child is removed or will be removed from a placement, the Division must provide notice of its actions. N.J.A.C. 10:122E-2.6. Relevant to this case, "[t]he Division representative shall notify . . . the family part of the Chancery Division of the Superior Court, and the child's Law Guardian . . . when there is a change in placement of any child in placement known to the court." N.J.A.C. 10:122E-2.6(c) (emphasis added). "If there is a difference of opinion between the resource family parent and the Division representative regarding the removal," the Division "shall inform the resource family parent" of his or her right to an administrative appeal. N.J.A.C. 10:122E-2.6(e).

## B.

We have in the past discussed the tension between the Division's statutory and regulatory authority, and the court's inherent parens patriae jurisdiction over children who are wards of the court pursuant to Title 30. In In re E.M.B., 348 N.J. Super. 31, 32-33 (App. Div. 2001), we reviewed orders from the Family Part that directed the Division to develop a new placement plan subsequent to a termination of parental rights. The dispute there centered on whether the Division's permanency

plan — foster parent adoption — or an alternative plan — adoption by the maternal grandparents — better served the child's best interests. Id. at 33. The Division argued on appeal that the court lacked jurisdiction to modify a placement after a termination of parental rights; it also contended that the grandparents' sole means of challenge was an administrative appeal. Id. at 42. We rejected both arguments concluding

> that the statutory scheme for review of a permanent placement plan by the child placement review board and the Family Part, as provided in the [CPRA], cannot be transmogrified into an administrative agency review process, effectuated through a change in the permanency planning goal by [the Division] that essentially coincided with the decision to terminate the parental rights of the birth parents in the guardianship case. Moreover, the [CPRA] contemplates an independent judicial review of [the Division's] permanency placement plan, separate and apart from any rights the grandparents may possess to contest the internal administrative decision of [the Division].

> [Id. at 48 (emphasis added).]

In another CPRA case, In re C.R., supra, 364 N.J. Super. at 266, the controversy centered upon the Division's refusal to consider placement of a child in a home in which three of her siblings already had been adopted because of regulatory "population limitation[s]."

> [T]he Family Part judge determined that he lacked jurisdiction to entertain the

> dispute, concluding that [the Division] ha[d] sole discretion in placing children in foster care and moving them from one foster home to another, subject to internal Division review and administrative appeal, and subject to judicial review only in the Appellate Division.
>
> [<u>Id.</u> at 267.]

We ultimately rejected arguments made by the Division, similar to those it advances now, and concluded

> [Division] policy cannot supercede the paramount authority of the Family Part, imbued with its traditional <u>parens patriae</u> responsibility and vested by the Legislature with the task of finally approving the permanency placement plans of children removed from their homes. If the Family Part possesses the responsibility and authority to approve such plans, . . . it follows logically that when a bona fide dispute is presented by parties with standing, between competing plans that are reasonably plausible, it is the Family Part that must resolve the dispute.
>
> [<u>Id.</u> at 283.]

## II.

We return to this case. Initially, we reject the Division's argument that the Family Part's review of its placement decision violates the separation of powers clause of the Constitution. As the preceding discussion reveals, the Family Part has the inherent jurisdiction to review placement decisions made by the Division with respect to a child who has been made a ward of the court.

Indeed, the Division's own regulatory scheme anticipates such a result. N.J.A.C. 10:122E-2.6(c) requires that "[t]he Division representative shall notify . . . the family part of the Chancery Division of the Superior Court, and the child's Law Guardian . . . when there is a change in placement of any child in placement known to the court." It would be nonsensical and contrary to the regulatory scheme to require the Division to provide notice, yet deny the Family Part judge an opportunity to assess whether a change in placement was in the child's best interest.

In our opinion, the judge's frustration with the Division's failure to abide by its own regulations was entirely understandable. The Division's decision to remove Tommy from Carl and Charlotte's home was done without any notice to the court, and it is unclear whether any notice was provided to the affected parties as required by the regulations.

Having said that, we agree with the Division that the judge could not require it to pay Carl and Charlotte as licensed resource parents. The Legislature has determined that the licensing of resource parent homes is delegated to the broad regulatory power of the Division. Denial of a license is subject to administrative review as outlined above.

"Courts have only a limited role to play in reviewing the actions of other branches of government." In re Musick, Dep't of Corrections, 143 N.J. 206, 216 (1996). "[O]ur review is circumscribed, lest we violate the Constitution's separation of powers." In re Veto of Minutes of New Jersey Racing Comm'n, 429 N.J. Super. 277, 291 (App. Div. 2012) (citation omitted), certif. denied, 214 N.J. 116 (2013). We find no authority suggesting that the Family Part's jurisdiction to resolve disputes over the placement of children already deemed wards of the court permits the judge to compel the Division to grant a license to a particular home.

Notably, in C.R., supra, 364 N.J. Super. at 283, we specifically did not resolve whether the Division's placement plan, or the alternative proposed by the adoptive parents of the child's siblings, should prevail. Instead, we held that the Family Part "shall consider the matter from a clean slate." Ibid. As such, we did not conclude that the Division's refusal to grant a waiver of its occupancy guidelines was improper.[6]

In sum, while we agree that the Family Part had inherent jurisdiction to review the Division's decision to remove Tommy from Carl and Charlotte's home, we reverse that part of the

_____

[6] Additionally, in C.R., we stayed the adoptive parents' administrative appeal pending resolution of the remand in the Family Part. 364 N.J. Super. at 283-84.

order that required the Division to treat the child's return to Carl and Charlotte's home as a "paid resource placement."

                                    III.

While the judge properly exercised his jurisdiction in deciding Tommy's best interests were served by his continued placement with Carl and Charlotte, we conclude he failed to appropriately consider all relevant statutory and regulatory factors. We therefore reverse the order requiring Tommy's continued placement with Carl and Charlotte and remand the matter for further proceedings consistent with the balance of this opinion.

Initially, we address the judge's stated concern regarding "the treatment of domestic violence findings and how that pertains to the Division's ability to license a home." While the Division's licensing decision is beyond the purview of the Family Part's review, it is quite clear that the Legislature, not the Division, has concluded no person may serve as a resource family parent "if that person or any adult residing in that person's household ever committed a crime that resulted in a conviction for" a variety of enumerated offenses, including "domestic violence." N.J.S.A. 30:4C-26.8(d)(9).

In 1999, the Legislature amended Title 30 to include this "domestic violence" disqualifier as part of an overall effort to

"conform State law to the provisions of the federal 'Adoption and Safe Families Act of 1997,' (ASFA)[,] Pub.L. 105-89." Bill Statement to S. 1705 (1999); L. 1999, c. 53, § 34. The Legislature noted that "ASFA . . . prohibits approval of applicants who have committed certain crimes[,]" and the amendment was intended "to identify . . . specific crimes that prohibit approval." Ibid.

ASFA requires a state receiving federal funding to

> provide procedures . . . , including procedures requiring that . . . in any case involving a child on whose behalf such payments are to be so made in which a record check reveals a felony conviction for child abuse or neglect, for spousal abuse, for a crime against children (including child pornography), or for a crime involving violence, including rape, sexual assault, or homicide, but not including other physical assault or battery, if a State finds that a court of competent jurisdiction has determined that the felony was committed at any time, such final approval shall not be granted[.]
>
> [42 U.S.C.A. § 671(a)(20) (emphasis added).]

The language used by Congress in enacting ASFA does not fit our existing Criminal Code with precision. For example, ASFA uses the term "felony conviction." Ibid. However, the adoption of the New Jersey Criminal Code in 1979 (the Code) eliminated the use of the terms "felonies" or "misdemeanors." N.J.S.A. 2C:1-4.

Nor does the Code include a specific offense labeled "spousal abuse."

This imprecision carried forward somewhat when the Legislature passed the 1999 amendments to Title Thirty. All of the disqualifiers listed in N.J.S.A. 30:4C-26.8(d) involve convictions for offenses defined as crimes under the Code, except subsection (9), which involves domestic violence.

Proceedings brought under the Prevention of Domestic Violence Act (PDVA) N.J.S.A. 2C:25-17 to -35, are civil in nature, and the burden of proof is by a preponderance of the evidence, not beyond a reasonable doubt, the standard required for a criminal conviction. J.D. v. M.D.F., 207 N.J. 458, 474 (2011); Crespo v. Crespo, 408 N.J. Super. 25, 40 (App. Div. 2009). Under the PDVA, "domestic violence" is defined as the "occurrence of one or more" predicate "acts." N.J.S.A. 2C:25-19(a). While all domestic violence predicate acts are offenses under the Code, they are not all crimes. See e.g., N.J.S.A. 2C:25-19(a)(13) (defining harassment, generally a petty disorderly persons offense, see N.J.S.A. 2C:33-4, as a predicate act of domestic violence).

"Although committing one of the predicate acts may also expose the offender to criminal prosecution, the Act did not create a new class of criminal offenses[.]" J.D., supra, 207

N.J. at 474 (citations omitted).  Separate from the relief available to a plaintiff in a hearing under the PDVA, N.J.S.A. 2C:25-27 provides that "[w]hen a defendant is found guilty of a crime or offense involving domestic violence," the court may impose restrictions on the defendant's ability to contact the victim as "a condition of sentence."  See J.D., supra, 207 N.J. 474.

The judge here seemingly concluded that because an action under the PDVA is civil in nature, the exclusion from licensing contained in N.J.S.A. 30:4C-26.8(d)(9) did not apply.  We disagree.

In enacting the PDVA, the Legislature declared

> that domestic violence is a serious crime against society; . . . that there is a positive correlation between spousal abuse and child abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence.
>
> [N.J.S.A. 2C:25-18 (emphasis added).]

Additionally, the Court has said "there is no such thing as an act of domestic violence that is not serious."  Brennan v. Orban, 145 N.J. 282, 298 (1996).  In our view, the Legislature determined that "spousal abuse" as used in AFSA, should include all offenses listed in the PDVA, whether crimes or not.  Moreover, the Legislature determined that a "conviction" for

domestic violence necessarily required the rejection of any resource parent license application. While an actor is not "convicted" of domestic violence under the Code, we believe the Legislature clearly intended that entry of a final restraining order under the PDVA, which necessarily presumes a finding that the defendant committed an act of domestic violence, meets the requirements for disqualification under N.J.S.A. 30:4C-26.8(d). This is the only interpretation consistent with both an implicit purpose of Title Thirty's licensing provisions, and a stated purpose of the PDVA, i.e., to insure to the extent possible that a child will not suffer the "deep and lasting emotional effects from exposure to domestic violence." N.J.S.A. 2C:25-18.

In this case, however, there was no final restraining order issued against Carl as a result of the incident in 2004. Although the statutory prohibition did not apply, the judge still should have considered all the facts and circumstances surrounding the 2004 incident in deciding whether Tommy's best interests favored his return. Although the events occurred nine years earlier, they involved a violent expression of Carl's anger that arose, in part, from the family dynamics in the household at the time. On remand, the judge should consider all of the circumstances surrounding the 2004 incident in deciding

whether placement with Carl and Charlotte is in Tommy's best interests.

The judge also expressed concern as to "whether a substantiation [of neglect], in and of itself, would require the removal of a child because the Division could not license a home." Under N.J.S.A. 30:4C-27.9, the Division is authorized to deny a license to an applicant for "good cause." Good cause includes a finding that "an incident of child abuse or neglect . . . has been substantiated." N.J.S.A. 30:4C-27.9(d); and see N.J.A.C. 10:122C-2.5(b)(7). However, the Division may issue the license if it "determines that the . . . applicant or adult household member poses no continuing risk of harm to the child and the issuance of the license is in the child's best interests[.]" Ibid.

As previously discussed, the judge may not order the Division to reach any particular decision in exercising its discretion to grant or deny a license in such situation. In other words, if the Division concludes there is good cause to reject an application for a license based upon a prior substantiated finding of abuse or neglect, the Family Part may not compel the Division to issue the license. However, in ordering a placement, the judge must consider whether the prior substantiated finding of abuse or neglect evidences a continuing

30

risk to the child such that the placement is not in the child's best interests.

In this case, the judge seemingly concluded that the passage of nine years, the lack of any referrals in the intervening years and Tommy's residence with Carl and Charlotte for several months before the Division filed its complaint all militated in favor of returning Tommy to his grandparents. However, on remand, the judge should also consider the serious nature of the allegations that led to the Division's substantiation of neglect, and that the incident arose out of the family dynamics at the time, and while children, including Kara, witnessed the events.

Lastly, N.J.S.A. 30:4C-27.9(i) also provides that the Division's denial of a license for good cause may be based upon "[a]ny conduct . . . which adversely affects or presents a serious hazard to the education, health, safety, general well-being or physical, emotional and social development of the child residing in the resource family home . . . ." Although this reflects the Legislature's determination that certain factors should guide the licensing decision, the statute has relevance to the court's consideration of any placement. The judge did not make specific findings regarding the incidents between Carl and the caseworkers that allegedly took place during the initial

placement on May 10. On remand, the judge should consider whether, if true, the reports made by the Division's workers are evidential of circumstances that adversely affect Tommy's best interests.

Because we are remanding the matter for further proceedings, we do not consider the Division's argument that the judge abused his discretion in not ordering psychological evaluations of Carl and Charlotte. The Division is free to pursue its request at the remand hearing.

Additionally, months have passed since we granted the Division's motion for leave to appeal. We have no information as to what may have transpired in that intervening time. Of course, we cannot know whether immediately removing Tommy from his maternal grandparents' care pending the remand hearing would be in his best interests. Therefore, despite our decision to reverse the June 10 order, we leave that decision to the judge's discretion.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

32                                                          A-4847-12T1