# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3315-20
      A-3318-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

  Plaintiff-Respondent,

v.

C.G. and J.D.,

  Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF N.D.
and NY-Z.D., minors.

_____

    Submitted March 16, 2022 – Decided March 30, 2022

    Before Judges Accurso, Rose and Enright.

    On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FG-03-0040-20.

Joseph E. Krakora, Public Defender, attorney for appellant C.G. (Amy Vasquez, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant J.D. (Beth Anne Hahn, Designated Counsel, on the briefs).

Matthew J. Platkin, Acting Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Wesley Hanna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In this consolidated appeal, defendants C.G. (Charlene) and J.D. (Jamal) appeal from a June 30, 2021 Family Part judgment terminating their parental rights to their biological children: Ny-Z.D. (Niesha), born in November 2013; and N.D. (Nelson), born in March 2019.[1] Jamal argues the Division of Child Protection and Permanency failed to establish all four prongs of the best interests standard under N.J.S.A. 30:4C-15.1(a)(1)-(4). Charlene primarily focuses on

---

[1] We use initials and pseudonyms to preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

the requirements of the third and fourth prongs.  The children's law guardian joins the Division in urging us to affirm.

In a cogent oral decision, the trial judge found the Division satisfied the four-prong test by clear and convincing evidence and held that termination was in the children's best interests.  In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999).  Based on our review of the record and applicable law, we are satisfied the evidence in favor of the guardianship petition supports the termination of defendants' parental rights.  See N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (holding that a reviewing court should uphold the factual findings regarding the termination of parental rights if they are supported by substantial and credible evidence in the record as a whole).  Accordingly, we affirm.

I.

The guardianship trial spanned three days in June 2021.  To support its claim that defendants' parental rights should be terminated, the Division presented the testimony of its adoption caseworker; Charlene's probation officer; Niesha's counselor; defendants' supervised visitation therapist; and Dr. Brian Eig, Psy.D., who performed psychological and parenting evaluations of both defendants, and bonding evaluations of the children with defendants and

their resource parents. The law guardian called its expert psychologist, Dr. Maureen Santina, Ph.D., who performed a bonding evaluation between the children and their resource parents. Jamal testified on his own behalf, stating he intended to marry Charlene; he proposed reunification of the family. Charlene did not testify or offer any evidence in her defense. Incarcerated at the time of trial, Charlene refused to appear until the final trial day. The Division also moved into evidence hundreds of documents, including the caseworkers' reports, bonding evaluations, and rule-out letters.

Defendants' history with the Division dates to their childhoods. Both were victims of domestic violence; Charlene witnessed her father kill her mother then himself. The Division first became involved with defendants as parents in March 2017, following a referral that Charlene was using and selling drugs, and living in a van with Niesha.[2] Jamal was incarcerated at the time. Charlene's sister, T.H., was granted custody of Niesha, with Charlene's consent. The Division closed its case.

---

[2] Charlene had a brief brush with the Division in 2010, after police arrested her for smoking marijuana in the presence of her biological daughter, N.K., born in November 2007. Charlene's sister, N.P., with whom N.K. was living, thereafter was granted legal and residential custody of the child. N.K. is not a party to this appeal. Jamal's two other biological children with another woman, J.D., Jr., born in September 2006, and J.D., born in August 2011, are in their mother's custody and are not parties to this appeal.

Nelson never lived with his parents. The Division became reinvolved with the family in March 2019, when the child was born suffering from withdrawal symptoms. Charlene had gone into labor while police were arresting her for shoplifting; she tested positive for cocaine and benzodiazepines on admission to the hospital. Jamal, who had been paroled on his previous convictions, told the Division he did not live with Charlene and was facing incarceration the following month on other charges. Nelson's maternal aunt, T.E., was granted custody of Nelson, but that placement was short-lived when Charlene and Jamal failed to provide financial assistance and Charlene visited Nelson under the influence. Nelson was placed in his current resource home.

Two months later, in May 2019, Niesha was removed from T.H.'s care after the Division received a referral that another child in her home was neglected. Niesha told the Division both parents hit her with a belt, and her father struck her mother in the face with a bottle. Charlene acknowledged Jamal "might have hit [her,]" and Jamal has hit Niesha with a belt as punishment. Jamal denied striking Charlene, but acknowledged he was incarcerated and accused of domestic violence after Charlene was hospitalized for the incident.

Niesha, then five-and-a-half years old, was placed in the same resource home as her infant brother. The siblings have resided together in that home ever

since. Niesha and Nelson both suffer from health problems requiring special care and attention. Their resource parents have expressed their unequivocal desire to adopt the children and remain open to fostering the children's relationship with defendants.

During the course of the litigation, the Division offered a multitude of services to defendants, including psychological and substance abuse evaluations, parenting skills classes, supervised parenting time, domestic violence counseling, and assistance with transportation. But defendants were largely noncompliant with the services provided. They regularly failed to appear for drug screens and court hearings. The only drug screening Charlene completed yielded a positive result for Xanax and opiates. Charlene failed to complete a substance abuse treatment program. She also declined to attend a psychological evaluation, thereby preventing the Division from assessing necessary services. Jamal was incarcerated during much of the litigation. He completed one drug screening and tested positive for cocaine and suboxone. Neither defendant obtained stable housing.

Because Jamal failed to engage in mandated batterer's services, the Division provided defendants separate visitation with the children. Charlene's visitation was inconsistent. Between May and September 2019, Charlene

missed sixteen of twenty-four visits. The missed visits negatively impacted Niesha, who screamed and cried, experienced bathroom accidents, and had nightmares that she was kidnapped by relatives. Jamal failed to visit the children during his scheduled sessions. Although he often drove Charlene to her visitation sessions, Jamal refused to participate in his sessions, contending "he d[id] not want to split his time with [Charlene,]" and "his children should see their parents together."

All relatives identified by defendants were considered by the Division as potential placements for the children, including: maternal aunt, M.G., whose home did not have adequate space; maternal aunt, D.H., who had "reservations" about assuming custody in view of her work schedule; and paternal aunt, N.H., who withdrew from consideration following surgery. The Division sent rule-out letters advising all three relatives to contact the Division for reassessment should their circumstances change. The rule-out letters provided notification of their right to appeal the Division's decision. The three relatives neither appealed nor contacted the Division for reassessment. Defendants identified no other relatives as potential placements for Niesha and Nelson.[3]

---

[3] In April 2019, the Division also considered T.H. as a placement for Nelson, but T.H. refused to submit to a urine screening and told the Division "this case

Based on the evidence adduced at the guardianship trial, the judge considered each prong of the best interests test and gave careful attention to the importance of permanency and stability for the children. The judge credited the testimony of all witnesses called by the Division and the law guardian. Noting Jamal testified about a desire to change his self-destructive behavior, the judge nonetheless recognized Jamal's plan for the children lacked certainty and, as such, "the children c[ould] not wait." Ultimately, the judge concluded the Division demonstrated by clear and convincing evidence that termination of defendants' parental rights was in the children's best interests. N.J.S.A. 30:4C-15.1(a); K.H.O., 161 N.J. at 347-48. These appeals followed.

II.

Our review of a judgment terminating parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). We are bound to accept the trial court's findings, as long as they are "supported by adequate, substantial, and credible evidence." Ibid. (citing N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). Additionally, we accord a family court's decision particular deference in view of its "special jurisdiction and expertise in

---

was bringing too much attention to her home." The following month, Niesha was removed from T.H.'s home.

family matters," and because the court is uniquely in a position to evaluate the credibility of the witnesses. Cesare v. Cesare, 154 N.J. 394, 413 (1998). We review the trial court's legal interpretations de novo. R.G., 217 N.J. at 552-53.

Parents have a fundamental right to raise their children, and that right is constitutionally protected. N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). "[T]erminations should be granted sparingly and with great caution because they irretrievably impair imperative constitutionally-protected liberty interests and scores of centuries of societal family constructs." R.G., 217 N.J. at 553 (internal quotations omitted). But a parent's rights are not absolute. Ibid. "Because of its parens patriae responsibility, the State may terminate parental rights if the child is at risk of serious physical or emotional harm or when necessary to protect the child's best interests." Id. at 553-54 (citing N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 599 (1986)). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

To effectuate these concerns, the Legislature created a test for determining when a parent's rights must be terminated in a child's best interests, requiring the Division to prove by clear and convincing evidence the following four prongs:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;[4]

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement

---

[4] Effective July 2, 2021, the Legislature enacted L. 2021 c. 154, amending laws pertaining to the standards for terminating parental rights and the placement of children with relatives or kinship guardians. N.J.S.A. 30:4C-15.1(a)(2) was amended to exclude from consideration the harm to children caused by removal from their resource parents. Accordingly, the second sentence of prong two was stricken from the revised statute. The amendments also encourage placement with relatives or kinship guardians and eliminate the requirement from N.J.S.A. 3B:12A-6(d)(3) that "adoption of the child is neither feasible nor likely" for a kinship legal guardian to be appointed.

In a footnote of his merits brief, Jamal argues prong two, as revised, should apply retroactively; Charlene notes the amendment without argument. We discern no reason to apply the amendment retroactively. See James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563 (2014) (recognizing "[s]ettled rules of statutory construction favor prospective rather than retroactive application of new legislation"); see also In re Guardianship of B.L.A., 332 N.J. Super. 392, 400-05 (Ch. Div. 2000) (considering retroactive application of statutes in the context of child protective services litigation).

A-3315-20

outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a)(1)-(4).]

The four prongs are not independent of one another. Rather, they "are interrelated and overlapping[,] . . . designed to identify and assess what may be necessary to promote and protect the best interests of the child." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). Parental fitness is the crucial issue. K.H.O., 161 N.J. at 348. Determinations of parental fitness are very fact sensitive and require specific evidence. Ibid. Ultimately, "the purpose of termination is always to effectuate the best interests of the child, not the punishment of the parent." Id. at 350.

We first consider Jamal's contentions that the trial judge's findings were insufficient to establish the first and second prongs of the best interests test. Jamal argues he did not cause harm to the children, and his imprisonment, inconsistent housing, on-call employment, and substance abuse, "alone," do not support the judge's finding he caused harm to the children. He further contends the Division's involvement "was almost entirely driven by Charlene's conduct,"

yet the Division failed to work with him toward a plan of reunification. We are not persuaded.

Relevant here, "[w]hen the condition or behavior of a parent causes a risk of harm, such as impermanence of the child's home and living conditions, and the parent is unwilling or incapable of obtaining appropriate treatment for that condition, the first subpart of the statute has been proven." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 223 (App. Div. 2013); see also N.J. Div. of Youth & Fam. Servs. v. L.M., 430 N.J. Super. 428, 444 (App. Div. 2013) (holding that a parent's "continued drug use, lack of appropriate housing, and failure to attend treatment, clearly posed a risk to the children" and satisfied prong one of the best interests test).

The second prong "relates to parental unfitness." K.H.O., 161 N.J. at 352. "[T]he inquiry centers on whether the parent is able to remove the danger facing the child." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 451 (2012). This prong is satisfied "by demonstrating that the parent has not cured the problems that led to the removal of the child." H.R., 431 N.J. Super. at 224. "In other words, the issue becomes whether the parent can cease causing the child harm before any delay in permanent placement becomes a harm in and of itself." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 434 (App. Div.

2001); see also N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 512 (2004) (holding that prong two was proven by clear and convincing evidence where the parents repeatedly failed "to comply with [the Division's] recommendations and court orders for services," and "were not in a position to care for their children" at the time of trial).

As is often the case, the trial judge's findings regarding the first prong, informed and overlapped the second. See R.L., 388 N.J. Super. at 88. The judge's prong one and prong two findings not only focused on Jamal's extended incarceration, housing issues, irregular employment, and drug abuse – in the aggregate – but also on Jamal's inability to eliminate the harm, despite the Division's efforts to assist him. The judge found Jamal's reunification plan was "insufficient," based on a desire to move "within sixty to ninety days." Citing "[t]he various problematic personality traits identified by Dr. Eig," the judge concluded Jamal's plan for the children was "not in their best interests." The record supports the judge's findings.

Moreover, our Supreme Court has recognized that although imprisonment alone is insufficient to establish parental unfitness, "particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard" can support termination of parental rights of an incarcerated parent.

13

R.G., 217 N.J. at 556.  In R.G., the Court found "the Division failed to show by clear and convincing evidence that [the defendant-father's] incarceration caused harm to [the child]" because the father "parented [the child] prior to his incarceration," and remained a part of the child's life and communicated with the child while incarcerated.  Id. at 559-60.

Jamal's reliance on R.G. to support his arguments as to the first and second prongs is misplaced.  Unlike the defendant in R.G., Jamal never lived with Nelson, and his parenting time with Niesha was limited.  The judge also expressed concerns that Jamal planned to marry Charlene, notwithstanding Niesha's expressions of anxiety relating to visits with her mother.  As the trial judge correctly noted, Jamal had not engaged in services, despite the Division's efforts to assist him.  Nor did he attend the bonding evaluation conducted by Dr. Santina.  And Jamal missed a drug screening the week prior to trial.  Contrary to Jamal's assertions, the trial judge's findings of harm and Jamal's inability to eliminate that harm were not based upon his incarceration alone – or any single factor.

We next address defendants' arguments that the Division failed to satisfy prongs three and four.  Prong three requires the Division to establish it "made reasonable efforts . . . to help the parent correct the circumstances which led to

14

the child's placement outside the home" and considered alternatives to termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3).

In view of the services offered to both defendants, we find insufficient merit in their contentions that the Division failed to make reasonable efforts to assist them to warrant discussion in this written opinion. R. 2:11-3(e)(1)(E). We affirm for the reasons expressed by the trial judge, and simply note the reasonableness of the Division's efforts is not measured by whether those efforts were successful in bringing about reunification of parent and child. In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999). Nor are we persuaded by defendants' belated attempts to blame the pandemic for their non-compliance with services. Indeed, defendants were unable to comply with in-person services when offered.

We turn instead to defendants' contentions that the Division failed to properly evaluate suggested relatives and failed to evaluate other – unspecified – relatives. Defendants belatedly claim that had the Division located a suitable relative, the children's best interests would have been better served by kinship legal guardianship[5] than adoption by unrelated resource parents. Defendants' contentions are unavailing.

_____

[5] See N.J.S.A. 3B:12A-1 to -7.

15                                                                          A-3315-20

The Division has a statutory obligation to "search for relatives or persons with a kinship relationship with the child who may be willing and able to provide the care and support required by the child."  N.J.S.A. 30:4C-12.1(a); see also N.J. Div. of Child Prot. and Permanency v. K.N., 435 N.J. Super. 16, 29 (App. Div. 2014), aff'd as modified, 223 N.J. 530 (2015).  We have nonetheless held "the Division has [no] obligation to search the fifty states or even the twenty-one counties to identify a parent's siblings, cousins, uncles and aunts."  N.J. Div. of Youth & Fam. Serves. v. K.L.W., 419 N.J. Super. 568, 582 (App. Div. 2011).  Nor can a parent "expect the Division to locate a relative with no information."  Ibid.  The reasonableness of the Division's efforts to consider alternatives to termination is fact sensitive.  A.G., 344 N.J. Super. at 435.

Here, citing our decision in K.L.W., the trial judge found "[v]arious family members were assessed"; "some were assessed more than once"; and the Division reasonably focused on relatives who were identified by defendants. Those relatives were ruled out based on their lack of space or because they withdrew from consideration.  Accordingly, the judge concluded: "Maintaining focus on identified individuals is more logical than casting a wide net, seeking various relatives about whom there is little or no contact information." Moreover, the adoption worker testified she discussed kinship legal

16                                                                    A-3315-20

guardianship with the resource parents, but they were committed to adoption.[6] See P.P., 180 N.J. at 512-13 (holding kinship legal guardianship should only be considered when adoption is not possible).

"[T]o satisfy the fourth prong, the State should offer testimony of a well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." M.M., 189 N.J. at 281 (internal quotation marks omitted). An important consideration under this prong is the "child's need for permanency." Ibid. "Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his [or her] most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453.

Citing this court's opinion in A.G., the judge determined the children's "[p]ermanency should not be delayed" while defendants attempted to comply with services. 344 N.J. Super. at 438 ("Keeping [children] in limbo, hoping for some long term unification plan, would be a misapplication of the law."). In reaching his decision, the judge considered defendants' concerns, raised during

---

[6]  We recognize the Legislature has since amended the kinship legal guardianship statute by deleting the requirement that adoption need not be feasible or likely. As previously stated, however, we are not convinced the amendments should be applied retroactively.

cross-examination of Dr. Eig, that the children would be raised by a same-sex couple of another race. Acknowledging defense counsel's questioning on cross-examination prompted Dr. Eig to consider "whether he was sufficiently sensitive to racial considerations regarding adoption of black children by a white lesbian couple," the judge nonetheless credited the expert's conclusions, finding they were consistent with those of Dr. Santina.

The uncontroverted expert evidence in this case provides overwhelming support for the trial judge's determination that there is a strong bond between the children and their resource parents and that the children would suffer serious and enduring emotional or psychological harm if they were separated from their resource parents. Niesha has expressed fear of being hurt or abandoned by defendants and Nelson has never lived with them. Indeed, Nelson has lived with his resource parents continuously since shortly after his birth, and Niesha has lived in the same home since May 2019. According to Dr. Santina "the children view the resource parents as their parental figures." In sum, this is a case in which "termination of . . . parental rights [will] secure for [Niesha and Nelson] a safe, loving home and the care of . . . stable adult[s] who [are] intent on assuring the child[ren]'s psychological and physical well-being." N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 248 (App. Div. 2010).

To the extent we have not addressed a particular argument, it is because either our disposition makes it unnecessary, or the argument was without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3315-20